IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 91-10126 (WCH) |
| Bank of New England Corporation, | ) | (Chapter 7) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| | ) | |
| HSBC Bank USA, National Association | ) | |
| as Indenture Trustee and as Successor | ) | |
| Indenture Trustee to JPMorgan Chase | ) | No. 09-cv-10829 (JLT) |
| Bank f/k/a The Chase Manhattan Bank, | ) | |
| as Indenture Trustee, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Bank of New York Trust Company, | ) | |
| National Association, as Indenture Trustee, | ) | |
| and U.S. Bank, National Association, as | ) | |
| Indenture Trustee, | ) | |
| | ) | |
| Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Bank of New England Corporation, Dr. | ) | |
| Ben S. Branch, Chapter 7 Trustee. | ) | |

**JOINT BRIEF OF APPELLEES THE BANK OF NEW YORK
MELLON TRUST COMPANY, NATIONAL ASSOCIATION AND U.S. BANK
NATIONAL ASSOCIATION, AS JUNIOR INDENTURE TRUSTEES**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.................................. 3

STANDARD OF REVIEW ............................................................................. 4

STATEMENT OF THE CASE........................................................................... 5

I.      The BNEC Debt Issues .................................................................... 5

II.     The Fourth Distribution Motion........................................................ 7

III.    The First Circuit Decision ............................................................... 8

IV.     Subsequent Bankruptcy Court Proceedings ...................................... 9

ARGUMENT .............................................................................................. 14

I.      THE BANKRUPTCY COURT PROPERLY DETERMINED, AS A
        FACTUAL MATTER, THAT THE PARTIES TO THE JUNIOR
        INDENTURES DID NOT INTEND FOR SUBORDINATION TO EXTEND
        TO POST-PETITION INTEREST. ............................................................ 14

        A.      The Bankruptcy Court's Factual Finding that the Parties to the
                Junior Indentures Did Not Intend for Subordination to Extend to
                Post-Petition Interest Is Amply Supported by the Evidence. ......... 16

                1.      Expert Testimony Established the Understanding in the 1980s
                        Debt Securities Markets that Post-Petition Interest Must Be
                        Explicitly Referenced In Subordination Agreements to be
                        Included. ................................................................... 16

                2.      Model Indentures and Scholarly Publications from the 1980s
                        Established that Practitioners and Academic Commentators
                        Understood the Rule of Explicitness to be in Effect............... 20

                3.      The Bankruptcy Court's Finding that Investment Bankers in
                        the 1980s Expected that Interest Would Cease Upon
                        Bankruptcy is Well-Supported by the Record. .................... 23

                4.      The Contemporaneous Transactional Evidence Presented Was
                        Consistent With the Expert Testimony............................... 26

(a)    **John Cashin, Who Executed the 1989 Junior Indenture, Understood the Subordination Provisions Not To Include Post-Petition Interest** ............................................................ 26

(b)    **The Documentary Evidence Supported the Conclusion that Law Firms Drafting the Junior Indentures Did Not Intend to Include Post-Petition Interest in the Senior Note Holders' Subordination Entitlements.** .................... 27

B.    **The Bankruptcy Court Adhered to General Legal Principles, and Did Not Read a Bankruptcy-Specific Rule of Explicitness Into New York Law.** ................................................................................ 31

II.    **THE SENIOR TRUSTEE HAS NOT IDENTIFIED ANY ERRORS OF LAW COMMITTED BY THE BANKRUPTCY COURT.** ......................................... 36

A.    **The Bankruptcy Court Properly Construed the Phrase "Due or to Become Due" Under New York's General Contract Law.** ............................ 36

B.    **The Senior Trustee's Proffered Interpretations of the Junior Indentures, as a Matter of Law, Do Not Withstand Scrutiny.** ...................... 38

1.    **Case Law Relating to Guarantor Obligations Has No Bearing on This Case.** .......................................................... 39

2.    **The Definition of Senior Indebtedness in the Indentures Does Not Include Post-Petition Interest.** ........................................ 42

3.    **The Provision in the Junior Indentures Concerning Continuing Events of Default Sheds No Light on the Underlying Ambiguity in the Subordination Provisions** ............................................. 44

4.    **The Different References to Junior and Senior Notes in the Subordination Provisions Do Not Indicate that the Holders of Senior Notes Are Entitled to Post-Petition Interest.** ........................... 45

C.    **The Bankruptcy Court Correctly Declined to Apply the Doctrine of *Contra Proferentem*.** ............................................................... 46

CONCLUSION ................................................................................................ 50

# TABLE OF AUTHORITIES

## CASES

*2 Tudor City Place Assoc. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247 (2d Cir. 1991) ......... 35

*67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245 (1975) ............................................. 47

*Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669 (2d Cir. 1997)............................................. 47

*Album Realty Corp. v. Am. Home Assurance Co.*, 80 N.Y.2d 1008 (1992) ................................. 14

*Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortgage Corp.)*,
      514 F.2d 400 (2d Cir. 1975) ............................................................................................. 8

*Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47 (1918) .................................................... 14

*Boston Car Co. v. Acura Auto. Div., Am. Honda Motor Co, Inc.*, 971 F.2d 811
      (1st Cir. 1992)................................................................................................................... 4

*Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212
      (11th Cir. 2006)............................................................................................................... 35

*Brown v. Utica Mut. Ins. Co.*, 53 N.Y.S.2d 760 (Sup. Ct. 1945)................................................ 35

*Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*,
      156 F.3d 1114 (11th Cir. 1998) .................................................................................... 8, 22

*Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*,
      93 N.Y.2d 178 (1999) .................................................................................................. 8, 22

*Columbia Hosp. v. Hraska*, 338 N.Y.S.2d 527 (Civ. Ct. N.Y. Cty. 1972) ................................ 39

*Cont'l Illinois Nat'l Bank and Trust Co. of Chicago v. First Nat'l City Bank of New York*
      *(In re King Resources Co.)*, 528 F.2d 789 (10th Cir. 1976) ....................................... 8

*Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, No. 03 Civ. 6146,
      2004 WL 1871525 (S.D.N.Y. Aug. 19, 2004)................................................................... 41

*DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714 (S.D.N.Y. 2003) ........................ 48

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
      Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) ............................................................... 17

*Dinerman v. Nat'l Bank of North America*, 390 N.Y.S.2d 1002 (Sup. Ct. 1977) ................. 11, 32

*Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110 (1956) ....................................................... 9, 11, 15, 32

*Duryea v. Lohrke*, 121 N.Y.S. 138 (1st Dept. 1910) ................................................................. 40

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154 (2d Cir. 2001) ............................. 4, 16

*FDIC v. Municipality of Ponce*, 904 F.2d 740 (1st Cir. 1990) ................................................... 39

*First Fidelity Bank v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528
      (Bankr. S.D.N.Y. 1991) ................................................................................................... 19

*Gel Sys. Inc. v. Hyundai Engineering & Constr. Co.*, 902 F.2d 1024 (1st Cir. 1990).................. 4

*HSBC Bank USA v. Bank of New England Corp. (In re Bank of New England Corp.)*,
295 B.R. 419 (D. Mass. 2003) ............................................................................... 8

*HSBC Bank USA v. Dr. Ben S. Branch* (*In re Bank of New England Corp.*), 364 F.3d 355
(1st Cir. 2004) ...................................................................... 1, 8, 9, 11
14, 15, 19, 31
34, 38, 41, 43, 45

*In re Bank of New England Corp.*, 269 B.R. 82 (Bankr. D. Mass. 2001) ..................................... 7

*In re Carp*, 340 F.3d 15 (1st Cir. 2003) .................................................................... 5

*In re Engage, Inc.*, 315 B.R. 217 (Bankr. D. Mass. 2004) ...................................................... 10

*In re Hawaii Daiichi-Kanko, Inc.*, 71 B.R. 176 (Bankr. D. Haw. 1987) ..................................... 39

*In re HRC Joint Venture*, 187 B.R. 202 (Bankr. S.D. Ohio 1995) ............................................. 40

*In re Time Sales Fin. Corp.*, 491 F.2d 841 (3d Cir. 1974) .................................................... 8

*Kurak v. Dura Automotive Sys., Inc. (In re Dura Automotive Sys., Inc.)*, 379 B.R. 257
(Bankr. D. Del. 2007) .......................................................................................... 17

*Lisk Elec., Inc. v. Fesco Plastics Corp. (In re Fesco Plastics Corp.)*, 996 F.2d 152
(7th Cir. 1993) ................................................................................................. 41

*Messina v. Lufthansa German Airlines*, 47 N.Y.2d 111 (1979) ................................................ 38

*Metro. West Asset Mgmt., LLC v. Magnus Funding, LTD*, No 03 Civ. 5539 (NRB),
2004 WL 1444868 (S.D.N.Y. 2004) ............................................................................ 48

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529 (S.D.N.Y. 1983)..... 32

*Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270 (2d Cir. 2000) .................... 47

*Nat'l Fin. Co. v. Perez*, 663 N.Y.S.2d 852 (1st Dept. 1997) ................................................. 39

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Robert Christopher Assocs.*,
691 N.Y.S.2d 35 (1st Dept. 1999) ............................................................................ 40

*Natwest USA Credit Corp. v. Alco Std. Corp.*, 858 F. Supp. 401 (S.D.N.Y. 1994) .................... 15

*Newman & Schwartz v. Aspludh Tree Expert Co., Inc.*, 102 F.3d 660 (2d Cir. 1996) ................ 48

*Ott v. Ott*, 698 N.Y.S.2d 137 (4th Dept. 1999) ............................................................... 32

*Pacifico v. Pacifico*, 190 N.J. 258 (2007) .................................................................... 48

*Pavone Textile Corp. v. Bloom*, 302 N.Y. 206 (1951)........................................................... 11

*RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199 (1st Cir. 1987) ........................ 49

*Rottkamp v. Eger*, 346 N.Y.S.2d 120 (Sup. Ct. 1973) ........................................................ 47

*Scotto v. Brink's Inc.*, 751 F. Supp. 335 (E.D.N.Y. 1990)...................................................... 14

*Skandia America Reinsurance Corp. v. Schenck*, 441 F. Supp. 715 (S.D.N.Y. 1977) .......... 12, 32

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop., LLC*, 467 F.3d 107 (2d Cir. 2006)................. 14

*State of Rio de Janiero v. E.H. Rollins & Sons, Inc.*, 64 N.Y.S.2d 230 (Sup. Ct. 1946)............. 40

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000) ........................................ 39, 40

*Time Warner Entm't Co. v. Brustowsky*, 634 N.Y.S.2d 82 (1st Dept. 1995) ............... 32

*Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946 (2d Cir. 1965) ......... 47

*United States v. Patriarca*, 912 F. Supp. 596 (D. Mass. 1995) ..................................... 10

*Unofficial Comm. of 13 1/2% Noteholders of Envirdondyne Indus., Inc. v. Environdyne Indus., Inc. (In re Environdyne Indus, Inc.)*, 29 F.3d 301 (7th Cir. 1994)............................. 17

*Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336 (1998) .................................... 14

## STATUTES

11 U.S.C. § 502(b)(2) ................................................................................ 24, 35, 41

11 U.S.C. § 510(a) ................................................................................ 8, 18, 21, 22, 26

FED. R. BANKR. P. 8013 ................................................................................ 4

## TREATISES

11 WILLISTON ON CONTRACTS § 32:12 (4th ed.) ............................................... 46

11 WILLISTON ON CONTRACTS § 32:7 (4th ed.) ................................................ 49

22 N.Y. JUR. 2D *Contracts* § 228 ................................................................. 32

28 N.Y. PRAC. *Contract Law* § 9:21 ............................................................. 14

28 N.Y. PRAC. *Contract Law* § 9:3 .............................................................. 38

63 N.Y. JUR. 2D *Guaranty and Suretyship* § 2 (1987)...................................... 39

COLLIER ON BANKRUPTCY, 15TH ED. REV. P. 502.03[3][a] .............................. 41

COLLIER ON BANKRUPTCY, 15th Ed. Rev. P. 502.06[2][b]................................ 41

Appellees The Bank of New York Mellon Trust Company, National Association ("BNY Mellon Trust"), as indenture trustee,[1] and U.S. Bank National Association ("U.S. Bank") as indenture trustee (together, the "Junior Trustees") for holders of subordinated debt of the Bank of New England Corporation ("BNEC") hereby submit this Joint Memorandum of Law.

## PRELIMINARY STATEMENT

This is an appeal of a judgment entered after a trial before the Bankruptcy Court, to answer the question whether the parties to BNEC's junior indentures intended the subordination provisions of those contracts to require the payment of post-petition interest to BNEC's senior noteholders before the junior noteholders receive any payment on account of the junior notes.

The Bankruptcy Court originally held, and this Court affirmed, that the indentures did not so require, holding as a matter of law that, once the senior noteholders were paid in full all principal and pre-petition interest on their notes — as BNEC senior noteholders had been paid here — then any remaining funds could be paid to the BNEC junior noteholders. The First Circuit reversed, holding that the question could not be answered without an evidentiary hearing into the intent of the parties to BNEC's junior indentures:

> [W]e find the subordination provisions ambiguous as to whether they provide for the priority payment of post-petition interest. This finding necessitates an examination into the intent of the parties — an inquiry which, in the circumstances of this case, entails questions of fact that must in the first instance be addressed by the bankruptcy court.

*HSBC Bank USA v. Dr. Ben S. Branch* (*In re Bank of New England Corp.*), 364 F.3d 355, 368 (1st Cir. 2004).

---

[1]    Formerly known as The Bank of New York Trust Company, National Association.

Bankruptcy Judge Hillman followed the First Circuit's instructions and held a three-day trial to examine the intent of the parties. He heard live testimony from two fact witnesses and four expert witnesses. He reviewed deposition testimony from another three witnesses. He examined nearly two hundred exhibits. And he made critical evaluations of the credibility of witnesses and evidence to ascertain, as a matter of fact, whether the parties to the contract intended the subordination to apply to post-petition interest.

Judge Hillman's answer after this comprehensive investigation was no, the parties to the BNEC junior indentures did *not* intend the subordination clauses to deny payment to junior noteholders until senior noteholders received post-petition interest. His decision, reflected in a well-reasoned fifty-page opinion, rested upon many grounds — from his assessment of the credibility of witnesses to his findings regarding the fundamental premises and processes of the debt securities market during the 1980s, when the junior indentures were executed.

In fact, as an examination of the trial record shows, the evidence presented left room for no other conclusion. The Junior Trustees presented uncontradicted fact testimony from a party who executed the junior indentures; live fact testimony from a senior officer of another party; expert testimony from an investment banker who advised scores of companies issuing subordinated debt in the 1980s; and a lawyer who specialized in subordination clauses in public indentures, served on the leading bar committees charged with examining and issuing standards for indenture provisions, and drafted the subordination clause in the ABA's current model indenture. The Junior Trustees also introduced numerous law review articles, treatises, ABA models, and a leading law firm manual — all confirming that the language chosen for these subordination clauses demonstrated that the parties did not intend to include post-petition interest within the scope of subordination.

2

The Senior Trustee offered practically no fact evidence to contradict this showing. The Senior Trustee's factual demonstration consisted of a couple of inapposite law review articles, an expert witness who professed ignorance of the issue, and an expert witness — an investment banker — whom Judge Hillman specifically found, after hearing his live testimony and cross-examination, not to be credible. The Senior Trustee offered no fact witness who could speak to the intent of the parties, and no evidence from anyone who had experience in drafting subordination clauses in indentures during the 1980s.

On appeal, it is not surprising that the Senior Trustee attempts to transform the issues determined below into issues of law, rather than of fact. The Senior Trustee urges this Court to interpret the words of the indentures' subordination provisions as a matter of law, devoid of the factual record. But the First Circuit already established in remanding that the contract provision at issue is ambiguous and that the question of the parties' intent is one of fact, not law.

The overwhelming weight of the evidence supports Judge Hillman's factual findings. Under the applicable standard of review, this Court should affirm unless Judge Hillman's factual determination was in clear error. There was no error. This Court should affirm the Bankruptcy Court's determination, made after a full and thorough trial.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Did the Bankruptcy Court commit clear error when it determined that the weight of the evidence supported a factual finding that the parties to the BNEC Junior Indentures did not intend to subordinate the junior debt to the post-petition interest claims of holders of senior debt?

## STANDARD OF REVIEW

The Bankruptcy Court's decision regarding the intent of the parties to the Junior Indentures — contracts previously found ambiguous by the Court of Appeals for the First Circuit — is premised on findings of fact made after a three-day trial at which documents, deposition testimony and six live witnesses were presented. The Bankruptcy Court's Order granting the Fourth Distribution Motion can be reversed *only* if it is determined that the Court committed clear error in its findings. *See* FED. R. BANKR. P. 8013 (A bankruptcy court's "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 174 (2d Cir. 2001) (applying New York law) (quotations omitted).

The First Circuit applies the clearly erroneous standard of review where, as here, a trial court's decision regarding the meaning of ambiguous contract terms is based on extrinsic evidence, including an assessment of the credibility of witnesses. *See Boston Car Co. v. Acura Auto. Div., Am. Honda Motor Co, Inc.*, 971 F.2d 811, 815 (1st Cir. 1992) ("If [a] contract provision is ambiguous, a finding as to the meaning of a writing will be reviewed under the clearly erroneous standard.") (internal quotation marks omitted); *Gel Sys. Inc. v. Hyundai Engineering & Constr. Co.*, 902 F.2d 1024, 1027 (1st Cir. 1990) ("[I]n the present case, the court clearly relied in part on extrinsic evidence of the parties' intent and therefore the clearly erroneous standard of Fed. Civ. P. 52(a) applies.") (quotations omitted).

Under a clearly erroneous standard, "if the bankruptcy court's findings are supportable on any reasonable view of the record," this Court is "bound to uphold them." *In re Carp*, 340 F.3d 15, 22 (1st Cir. 2003).

## STATEMENT OF THE CASE

### I.    The BNEC Debt Issues

BNEC, a Massachusetts corporation and a bank holding company, filed for bankruptcy under Chapter 7 of the Bankruptcy Code on January 7, 1991. (ST App. Ex. 1 at ¶¶ 1-2.)[2]  Dr. Ben S. Branch (the "Chapter 7 Trustee") serves as the duly elected and qualified Chapter 7 trustee of the BNEC bankruptcy estate.  (ST App. Ex. 1 at ¶ 3.)

Prior to its bankruptcy, BNEC sold six different series of debt instruments into the public markets.  Three of the debt instruments, issued in 1973, 1974 and 1986, are senior debt.[3] HSBC Bank USA, National Association ("HSBC" or the "Senior Trustee") currently serves as indenture trustee for the Senior Notes.  The remaining three BNEC debt instruments, sold by BNEC in 1984, 1987 and 1989, are subordinated debt.[4]  In total, BNEC issued $525 million in

---

[2]    All references to "ST App. Ex." are references to the exhibits submitted to this Court in the Senior Trustee's Appendix of Exhibits to the Appellant's Brief; all references to paragraphs in ST App. Ex. 1 are references to the numbered paragraphs in the "Admitted Facts" section of that document, which begins on page 8.  All references to " JT App. Ex." are to the exhibits submitted in the Junior Trustees' Appendix of Exhibits to the Appellees' Brief.

[3]    The three issues of BNEC senior debt are: (<u>a</u>) $25 million in 7 5/8% Debentures issued by a predecessor to BNEC in 1973; (<u>b</u>) $20 million in 8.85% Debentures issued by a predecessor to BNEC in 1974; and (<u>c</u>) $150 million in 9 1/2% Notes issued by BNEC in 1986 (collectively, the "Senior Notes"). (ST App. Ex. 1 at ¶¶ 7-12.)  The governing indentures for the Senior Notes are referred to collectively as the "Senior Indentures."

[4]    The three issues of BNEC subordinated debt are: (<u>a</u>) $75 million in Floating Rate Subordinated Notes issued by BNEC in 1984; (<u>b</u>) $200 million in 8 3/4% Subordinated Capital Notes issued by BNEC in 1987; and (<u>c</u>) $250 million in 9 7/8% Subordinated Notes issued by BNEC in 1989 (collectively, the (continued…)

principal amount of Junior Notes during the 1980s, which remains outstanding. (ST App. Ex. 1 at ¶ 29.) U.S. Bank serves as junior indenture trustee for the Floating Rate Subordinated Notes and the 8 3/4% Subordinated Capital Notes issued under the 1983 and 1987 Junior Indentures, respectively. (ST App. Ex. 1 at ¶ 5.) BNY Mellon Trust serves as junior indenture trustee for the 9 7/8% Subordinated Capital Notes issued under the 1989 Junior Indenture. (ST App. Ex. 1 at ¶ 6.) The Junior Indentures are governed by New York law. (ST App. Ex. 5 at 13; ST App. Ex. 6 at 23; ST App. Ex. 7 at 80.)

The Chapter 7 Trustee has made three distributions to creditors in the Chapter 7 case. (ST App. Ex. 1 at ¶ 23.) The third and most recent distribution to creditors occurred in late 1999, at which time the Senior Notes were fully paid all principal and pre-petition interest outstanding at the time of the filing of the bankruptcy petition, together with all approved fees and expenses, including attorneys' fees. (ST App. Ex. 1 at ¶¶ 25-27.) In addition, the Senior Trustee was given a reserve for future fees and expenses, subject to review of those fees and expenses by the Chapter 7 Trustee and the Bankruptcy Court. (ST App. Ex. 1 at ¶ 28.)

In its Third Distribution Notices, the Senior Trustee informed holders of Senior Notes that the Chapter 7 Trustee did not expect to make any further distributions on the Senior Notes and stated further that:

> Inasmuch as the Noteholders are being fully paid for all outstanding principal and pre-petition interest amounts, any amounts remaining in the reserve and not used by [the Senior Trustee] will be returned to the [Chapter 7] Trustee for distributions to the subordinated noteholders."

(JT App. Exs. 1-2.)

---

"Junior Notes"). (ST App. Ex. 1 at ¶¶ 14-17.) The governing indentures for the Junior Notes are referred to collectively as the "Junior Indentures."

## II.    The Fourth Distribution Motion

On May 23, 2001, the Chapter 7 Trustee filed the Fourth Distribution Motion seeking to make a fourth interim distribution to creditors, including holders of Junior Notes. The bankruptcy estate then had approximately $11 million available for distribution[5] (ST App. Ex. 1 at ¶ 32) and the Chapter 7 Trustee reported that, pursuant to the subordination provisions of the Junior Indentures, the holders of Senior Notes had been paid in full. (JT App. Ex. 3 at ¶ 16.) Accordingly, upon approval of the Fourth Distribution Motion, the Chapter 7 Trustee planned to make his first distribution for the benefit of holders of Junior Notes, who had not yet received any distributions notwithstanding their more than $525 million in outstanding principal claims against the estate. (ST App. Ex. 1 at ¶¶ 29, 32; JT App. Ex. 3 at ¶ 16.)

The Senior Trustee objected to the Fourth Distribution Motion. The Senior Trustee claimed that, despite BNEC's prior full payment of all principal and pre-petition interest on the Senior Notes, no distributions could be made by the BNEC estate to the holders of Junior Notes until the holders of Senior Notes were paid over ten years of post-petition interest. (ST App. Ex. 1 at ¶¶ 27, 33.)

The Bankruptcy Court overruled the Senior Trustee's objection and granted the Fourth Distribution Motion. The Bankruptcy Court held that the Junior Indentures were ambiguous on the issue of post-petition interest and, thus, failed to satisfy the "Rule of Explicitness." *In re Bank of New England Corp.*, 269 B.R. 82, 84-86 (Bankr. D. Mass. 2001) (noting that the Rule had been recognized by the New York Court of Appeals as part of New York state law). The Rule of Explicitness was a *per se* federal rule of contract construction that

---

[5]    As of September 30, 2008, the estate held in excess of $100 million. (ST App. Ex. 1 at ¶ 39.)

required indentures to specify explicitly that payment of junior debt was subordinate to the payment of post-petition interest claims of senior debt in order to achieve that particular prioritization from a bankruptcy estate.[6]

      This Court affirmed. *HSBC Bank USA v. Bank of New England Corp. (In re Bank of New England Corp.)*, 295 B.R. 419 (D. Mass. 2003). The Senior Trustee thereafter appealed.

## III.    The First Circuit Decision

      The First Circuit Court of Appeals reversed. *See HSBC Bank USA v. Dr. Ben S. Branch* (*In re Bank of New England Corp.)*, 364 F.3d 355, 363-64 (1st Cir. 2004). The Court of Appeals held that the enactment of Bankruptcy Code § 510(a)[7] in 1978 abrogated the Rule of Explicitness. *Id.* at 359. The First Circuit also declined to apply the holding of a 1999 decision by the New York Court of Appeals recognizing the Rule of Explicitness as a matter of New York state law,[8] after concluding that "states are not free to adopt rules of contract interpretation that apply only in bankruptcy." *Id.*

---

[6]     *See generally Cont'l Illinois Nat'l Bank and Trust Co. of Chicago v. First Nat'l City Bank of New York (In re King Resources Co.)*, 528 F.2d 789 (10th Cir. 1976); *Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortgage Corp.)*, 514 F.2d 400 (2d Cir. 1975); *In re Time Sales Fin. Corp.*, 491 F.2d 841 (3d Cir. 1974). Because the "Rule of Explicitness" was a *per se* rule, if a subordination agreement failed to expressly and unequivocally include post-petition interest in the subordination entitlements of senior debt, senior debt holders would not be entitled to receive post-petition interest from distributions allocable to junior debt *as a matter of law*. No factual inquiry into the contracting parties' intent was required.

[7]     Bankruptcy Code § 510(a) states that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." 11 U.S.C. § 510(a).

[8]     *See Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 93 N.Y.2d 178, 185 (1999) ("New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand."). In so ruling, the First Circuit parted company with the Eleventh Circuit, which had certified this question to the New York Court of Appeals in the *Southeast Banking* case. *See Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1125 (11th Cir. 1998).

The First Circuit examined the Junior Indentures under general principles of contract law. After examining the Junior Indentures in the light of the obligations imposed as a whole, the Court concluded that it was "impossible to glean the parties' intent from the language and structure of the instruments themselves" because the Junior Indentures were ambiguous on the subject of post-petition interest:

> [W]e find the words 'due or to become due' lacking in certitude as to whether they actually provide for the payment of post-petition interest on the Senior Debt prior to any payment referable to the Junior Debt."

*Bank of New England Corp.*, 364 F.3d at 367-68.

Accordingly, the Court of Appeals remanded the case to the Bankruptcy Court for "a contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances," under principles of New York contract law. *Id.* at 367. In remanding, the Court of Appeals instructed that "[t]o be sure, the backdrop of bankruptcy may inform the examination into the parties' intent" because of the "presumption 'that the parties had [the law in force at the time of agreement] in contemplation when the contract was made' and that the 'contract generally will be 'construed in light of such law.'" *Id.* at 368 n.5 (quoting *Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 116 (1956).

## IV.    Subsequent Bankruptcy Court Proceedings

Following remand, the parties engaged in extensive fact and expert discovery. On January 9, 2007, the Bankruptcy Court issued a ruling stating that "the issue [of burden of proof] should be treated as one akin to interpleader," and that the Senior Trustee and the Junior Trustees

each bore the burden of demonstrating by a preponderance of the evidence its entitlement to the estate funds held by the Chapter 7 Trustee.[9]

Commencing November 17, 2008, the Bankruptcy Court (per Hillman, J.) held a three-day evidentiary hearing. The parties presented testimony from five fact witnesses (either in person or through deposition testimony) and four expert witnesses. Nearly 200 documents were admitted into evidence. Following the close of trial on November 19, 2008, the parties submitted lengthy post-trial briefs, and the Bankruptcy Court heard closing arguments on January 29, 2009.

## V.    Bankruptcy Court Decision

On April 10, 2009, the Bankruptcy Court issued its Decision on Remand Regarding the Trustee's Motion for an Order Authorizing a Fourth Interim Distribution (the "Intent Decision") and related Order (the "Fourth Distribution Order"). After considering all of the evidence presented, including the credibility and demeanor of the witnesses,[10] Judge Hillman found the evidence presented by the Junior Trustees credible and convincing and concluded that "the language used did not entitle the Senior Trustee to receive the dividend otherwise payable from the estate to the Juniors." (*See* Intent Decision at 49.)

In so finding, Judge Hillman followed the First Circuit's instructions to the letter. First and foremost, the Bankruptcy Court made clear that it could not and did not apply the Rule

---

[9]    A "preponderance of the evidence" means evidence that, when considered and compared with the evidence opposed to it, has more convincing force and produces the belief that what is sought to be proven is more likely true than not true. *United States v. Patriarca*, 912 F. Supp. 596, 610 (D. Mass. 1995); *see also In re Engage, Inc.*, 315 B.R. 217, 224 (Bankr. D. Mass. 2004) ("preponderance of the evidence" means an amount of evidence that is enough to persuade the trier of fact that a fact in contention is more likely true than not true).

[10]    *See* Intent Decision at 2 ("In reaching my decision, I have considered the demeanor and credibility of all of the witnesses who testified, as well as the admitted exhibits and the submissions of counsel. Absence of any of these does not indicate a lack of consideration.").

of Explicitness in reaching its decision. (*See* Intent Decision at 22: "[T]he First Circuit held that '[f]or purposes of this case . . . the Rule of Explicitness is a dead letter," and I am bound by that holding.") Rather, consistent with the First Circuit's ruling, the Bankruptcy Court conducted a "contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances" through "differential factfinding." (*Id*. at 16-17, 27-49.) Further, following express instruction from the First Circuit, Judge Hillman examined the evidence to determine the intent of the parties in accordance with New York state law principles, starting with the New York rule of construction specifically highlighted by the First Circuit, that contracts should be construed in the light of the law in force at the time the agreement is made.[11] (*Id*. at 20-21.)

The Bankruptcy Court found that the law in force at the time the Junior Indentures were executed was the New York common law principle that "interest on an obligation ceases upon the filing of an insolvency proceeding of whatever nature by the obligor." (*See* Intent Decision at 23-26 & n.69 (citing *Pavone Textile Corp. v. Bloom*, 302 N.Y. 206 (1951), *aff'd sub nom. United States v. Bloom*, 342 U.S. 912 (1952)).) Judge Hillman proceeded to review the Junior Indentures to determine whether the parties specifically opted out of incorporation of the law, precisely as New York law requires.[12] He concluded — correctly — that the parties did not do so.

---

[11]    *See Bank of New England Corp.*, 364 F.3d at 368 n.5 ("To be sure, the backdrop of bankruptcy may inform the examination into the parties intent."); *Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 116 (1956) (noting the presumption 'that the parties had [the law in force at the time of the agreement] in contemplation when the contract was made," and that "the contract will be construed in light of such law.").

[12]    *See Dolman*, 2 N.Y.2d at 116 ("[I]t is basic that, *unless a contract provides otherwise*, the law in force at the time the agreement is entered becomes as much part of the agreement as though it were expressed or referred to therein." (emphasis added)); *Dinerman v. Nat'l Bank of North America*, 390 N.Y.S.2d 1002, 1006 (Sup. Ct. 1977) ("*[U]nless a contract specifically provides otherwise*, the law in force at the time an agreement is entered becomes as much a part of the agreement as though it was (continued…)

The Bankruptcy Court thus held that, under New York law, in the absence of language to the contrary, there is "a presumption that [the] drafters did not intend for the payment of interest accruing after the commencement of an insolvency proceeding." (Intent Decision at 27.) This factual presumption was subject to rebuttal by the Senior Trustee with extrinsic evidence demonstrating that the parties intended otherwise, and merely "set[] the stage" for further factual inquiry by the Bankruptcy Court. (*Id.*)

Judge Hillman engaged in an extensive review of the facts and circumstances surrounding the formation of the Junior Indentures to determine the intent of the parties. After a lengthy analysis of the factual evidence, he concluded that "the drafter of the Junior Indentures, had he or she wished to expand the subordination to include post-petition interest, would have added explicit language to accomplish that end." (*See* Intent Decision at 49.)

Judge Hillman relied upon documentary and testimonial evidence presented by the Junior Trustees, which he found to be both credible and persuasive, including: (a) James Gadsden, a corporate trust expert, who testified that during the 1980s, participants in the debt securities market, and particularly the lawyers drafting subordinated indentures, understood that "if senior creditors wanted to obtain post-petition interest, explicit provision would have to be made" (Intent Decision at 45-47); (b) Gilbert Matthews, an investment banking expert who testified that at the time the Junior Indentures were created, "the investment banking community understood that senior debt was paid in full when it had received the amount owed as of the petition date" (*id.* at 42); (c) numerous contemporaneous documents of the period (*id.* at 13 n.

---

expressed or referred to therein." (emphasis added)); *see also Skandia America Reinsurance Corp. v. Schenck*, 441 F. Supp. 715, 724 (S.D.N.Y. 1977) ("*Unless the contract provides otherwise*, the law in force at the time it is entered into becomes a part of the contract." (emphasis added)).

38, 30-34, 38-40, 47-49); and (d) fact witnesses, including the corporate trust officer who executed the 1989 Junior Indenture on behalf of the original indenture trustee (*id*. at 35-36).[13]

   In contrast, the Senior Trustee offered not a single fact witness to rebut the factual presumption "that [the] drafters did not intend for the payment of interest accruing after the commencement of an insolvency proceeding."[14]   (Intent Decision at 47.)  And Judge Hillman carefully considered the testimony of the Senior Trustee's investment banking expert, William H. Purcell, and found it not credible.   (*Id*. at 42, 48.)

   Judge Hillman thus performed the task assigned to him by the First Circuit:  He "considered the demeanor and credibility of all of the witnesses who testified, as well as the admitted exhibits and the submissions of counsel" and found that "the drafter of the Junior Indentures, had he or she wished to expand the subordination to include post-petition interest, would have added explicit language to accomplish that end."  (*See* Intent Decision at 2, 49).  The Bankruptcy Court therefore concluded that the language of the Junior Indentures "did not entitle the Senior Trustee to receive the dividend otherwise payable from the estate to the Juniors," and granted the Fourth Distribution Motion.  (*Id*. at 49)

---

[13]  The Bankruptcy Court did not find that there was no direct evidence of the parties' intent, as the Senior Trustee repeatedly asserts.  (*See* Appellant's Brief ("ST Brief") at 4, 7, 35.)  To the contrary, the Bankruptcy Court simply noted that the expert witnesses did not have personal knowledge of the intent of the drafters of the Junior Indentures.  (*See* Intent Decision at 19.)

[14]  In the proceedings below, the Senior Trustee attempted to persuade the Bankruptcy Court (as it does here) that the Junior Indentures have a "plain meaning" and should be interpreted as a matter of law.  (*See* Senior Trustee's Post-Trial Brief, Filed 1/21/2009, at 72-75 (Docket No. 2277).)  Given that the Bankruptcy Court and the First Circuit both previously found the Junior Indentures to be ambiguous — and therefore lacking a plain meaning — the Bankruptcy Court remained unpersuaded by this argument the second time around.   (*See* Intent Decision at 20:  "The language contains this ambiguity, there is no plain meaning, and the principles of contract interpretation must be applied.")

## ARGUMENT

**I.    THE BANKRUPTCY COURT PROPERLY DETERMINED, AS A FACTUAL MATTER, THAT THE PARTIES TO THE JUNIOR INDENTURES DID NOT INTEND FOR SUBORDINATION TO EXTEND TO POST-PETITION INTEREST.**

Judge Hillman's task in this case was clear:  Because the subordination provisions in the Junior Indentures were held to be ambiguous by the First Circuit, the First Circuit "remand[ed the case] for factfinding on the parties' intent vis-à-vis post-petition interest." *Bank of New England Corp.*, 364 F.3d at 368.  In so doing, the Bankruptcy Court was instructed  to adhere to "New York's generally applicable principles of contract law." *Id.* at 360.

New York's highest court — the Court of Appeals — has held that "[i]n determining the intent of the parties, our guide is the reasonable expectation and purpose of the ordinary business person when making an ordinary business contract." *Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 341 (1998) (internal quotation marks and brackets omitted); *Album Realty Corp. v. Am. Home Assurance Co.*, 80 N.Y.2d 1008, 1010 (1992); *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51 (1918).  Courts construing ambiguous contracts consider extrinsic evidence surrounding the formation of the contract, including the parties' understanding of the agreement; custom and usage in the trade; and the law in force at the time the agreement was made.[15]  28 N.Y. PRAC. *Contract Law* § 9:21; *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Prop., LLC*, 467 F.3d 107, 125-26 (2d Cir. 2006) (admitting evidence of parties' unexpressed understanding of agreement); *Natwest USA Credit Corp. v. Alco Std. Corp.*, 858 F. Supp. 401,

---

[15]    Extrinsic evidence may be direct or circumstantial; both are relevant to determining the parties' intent.  Even if "there is no evidence that the question at issue was expressly considered by any one at the time of the negotiation of the agreement, circumstantial evidence concerning the contract as a whole and the parties' practices throws light on the parties' intentions." *Scotto v. Brink's Inc.*, 751 F. Supp. 335, 341 (E.D.N.Y. 1990), *rev'd on other grounds*, 962 F.2d 225 (2d Cir. 1992).

413 (S.D.N.Y. 1994) ("When the terms of a contract are ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent."); *Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 116 (1956) (New York courts will presume "that the parties had [the law in force at the time of agreement] in contemplation when the contract was made," and that the contract generally will be "construed in light of such law.").

Following the First Circuit's instructions and these principles of New York law, Judge Hillman evaluated all of the evidence and found as a fact that the parties to the Junior Indentures did *not* intend for the holders of Senior Notes to recover post-petition interest prior to payment of the Junior Notes. There was no clear error in his findings.

The Senior Trustee argues that Judge Hillman failed to follow the First Circuit's instructions on remand, but its argument rests upon a mischaracterization of what both courts held. The First Circuit's ruling was very straightforward: According to the Court, the *per se* "Rule of Explicitness in its classic form" had been "extinguished" with the adoption of the Bankruptcy Code. *See Bank of New England Corp.*, 364 F.3d at 360. As the First Circuit held, "it [was] impossible to glean the parties' intent [with respect to post-petition interest] from the language and structure of the instruments alone." *Id.* at 368. Thus, the First Circuit required a broader examination of the parties' intent, and the Court remanded for "differential factfinding" to be conducted "in the first instance . . . by the bankruptcy court." *Id.*[16]

---

[16] Until the First Circuit rendered its opinion, the issue the parties had litigated was "whether the language of the subordination provisions satisfies the Rule of Explicitness." *See Bank of New England Corp.*, 364 F.3d at 361. The Rule of Explicitness that had been the focus of the litigation (including the briefing to the First Circuit) was a *per se* rule: If language in a subordination agreement failed to make explicit reference to post-petition interest, post-petition interest could not be recovered. As this litigation proceeded from the Bankruptcy Court to the District Court to the First Circuit, no inquiry had been made, and no evidence introduced, with respect to the intent of the parties. Instead, the focus of the parties'
(continued…)

Judge Hillman did precisely what the Court of Appeals directed: He conducted an evidentiary hearing that lasted three days, received testimony from nine witnesses, considered nearly two-hundred exhibits, and made findings of fact with respect to the parties' intent based upon his weighing of the evidence and assessments regarding the credibility of witnesses.

A.   **The Bankruptcy Court's Factual Finding that the Parties to the Junior Indentures Did Not Intend for Subordination to Extend to Post-Petition Interest Is Amply Supported by the Evidence.**

At trial, Judge Hillman heard direct and indirect evidence concerning the specific transactions and the understanding of the individuals and institutions who prepared or were parties to the Junior Indentures, as well as broader evidence concerning the prevailing understandings and practices of participants in the debt securities markets, including issuers, indenture trustees, investment bankers, and the attorneys that represented them.[17]  In making his findings, Judge Hillman carefully weighed all of this evidence to determine the parties' intent.

1.   **Expert Testimony Established the Understanding in the 1980s Debt Securities Markets that Post-Petition Interest Must Be Explicitly Referenced In Subordination Agreements to be Included.**

The Bankruptcy Court was persuaded by the expert testimony of James Gadsden,[18] a practicing attorney with 34 years of experience in the debt securities market.  Mr. Gadsden represented indenture trustees in the 1980s and also was involved in numerous

---

arguments was whether the language of the subordination provisions satisfied the *per se* rule.  *Id.*  In light of the First Circuit's ruling, an examination of the parties' intent became necessary for the first time.

[17]   An ambiguous contract may be construed by reliance on expert testimony concerning the commercial context in which the contract arose, including the relevant industry's expectations of what certain provisions mean.  *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 174-75 (2d Cir. 2001) (applying New York law—upholding contractual interpretation based on expert testimony about industry understanding of certain provisions).

[18]   *See* Intent Decision at 45 ("The testimony of James Gadsden [] added substantially to the picture of what was going on in [the debt securities] field in the 1980 period.").

professional committees that addressed developments in the marketplace, with a focus specifically on the issue of subordination in indentures.[19]

As draftsman of the subordination provisions in the ABA's 1999 Revised Model Simplified Indenture, Mr. Gadsden had undertaken a detailed study of how market expectations and practices had developed with respect to subordination provisions both before and after the publication of the Model Simplified Indenture in 1983 (the "1983 Model Indenture"). (ST App. Ex. 8 (11/18/08) at 113:14–114:25.) He explained the content and development of the 1983 Model Indenture which, along with its 1971 predecessor, was among the most authoritative and widely known references for drafting and interpreting indentures during the relevant time period.[20] (*Id.* at 118:6–121:21.)

Mr. Gadsden testified that in the 1980s, the debt securities market, and particularly the lawyers who negotiated and drafted indentures, understood that an insolvent debtor's obligation to pay interest on unsecured debt ceased upon the filing of a bankruptcy petition. (ST App. Ex. 8 (11/18/08) at 106:23–107:8.) He further testified that the prevailing

---

[19]    These committees included lawyers representing a broad spectrum of participants in the debt securities market, including investors, indenture trustees and debtors. In particular, the Business Bankruptcy Committee on Trust Indentures and Indenture Trustees solicited the views of representatives of "all parts" of the public debt markets. (ST App. Ex. 8 (11/18/08) at 106:6–110:4, 111:21–112:19.)

[20]    In *Envirodyne Industries*, Judge Posner of the Seventh Circuit discussed the utility of model indentures under New York law, finding them to be:

> entirely appropriate for use in contract cases as interpretive aids. Appropriate, and sometimes indispensable. It would be passing odd to forbid people to . . . consult explanatory commentaries that, like trade usage, are in the nature of specialized dictionaries. . . . *Cases in which courts use them to interpret contractual or statutory provisions are legion* . . . .

*Unofficial Comm. of 13 1/2% Noteholders of Envirdondyne Indus., Inc. v. Environdyne Indus., Inc. (In re Environdyne Indus., Inc.)*, 29 F.3d 301, 305 (7th Cir. 1994); *see also Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 139-140 (2d Cir. 2005); *Kurak v. Dura Automotive Sys., Inc. (In re Dura Automotive Sys., Inc.)*, 379 B.R. 257, 265-66 & n.7 (Bankr. D. Del. 2007).

form for subordination clauses in indentures limited the scope of junior creditors' subordination obligations by the issuer's obligation to the senior creditors — in other words, the obligations owed to junior creditors were only subordinate to the obligations that the debtor owed to senior creditors; the indentures did not create independent obligations owed by the junior creditors to the senior creditors.  (*Id.* at 107:9–108:5, 127:19–128:2.)

Most important, Mr. Gadsden explained that market participants recognized that when the parties to an indenture intended not to follow the prevailing practice, the subordination provision was changed to include explicit language making clear that the junior creditors' subordination obligations would include post-petition interest.  (ST App. Ex. 8 (11/18/08) at 127:6-18.)  During the 1980s, indentures were drafted in a manner consistent with what was understood to be the then-prevailing law (*i.e.*, the Rule of Explicitness).  (*Id.* at 152:3-15.)

Mr. Gadsden testified that this market understanding developed from the three circuit court decisions that gave rise to the Rule of Explicitness.  (ST App. Ex. 8 (11/18/08) at 116:12–117:9.) Mr. Gadsden further testified that, although the Rule of Explicitness is a "dead letter" today — *i.e.*, it is no longer a controlling *per se* rule of law in determining the enforceable scope of a subordination provision in this circuit — both the Rule and the circuit court cases that announced it were nevertheless "part of what you have to analyze in understanding what people thought they would accomplish . . . by a choice of words in the 1980s."  (*Id.* at 141:22–142:5 (emphasis in original).)  Such rules and judicial precedents invariably "influence what people . . . understand the rules to be and how they go about drafting agreements."[21]  (*Id*. at 142:13-20.)

---

[21]     Indeed, the Rule of Explicitness continued to be applied even after the last Junior Indenture was executed.  In the 1991 *Ionosphere* decision, the Bankruptcy Court for the Southern District of New York considered for the first time whether the Rule of Explicitness cases were at odds with Bankruptcy Code § 510(a) and concluded that the Rule of Explicitness retained its vitality notwithstanding the enactment of (continued…)

Judge Hillman agreed with Mr. Gadsden, noting that "the drafters' subjective understanding of the state of the law informs the parties' intent . . . ." (*See* Intent Decision at 23, n.65.) The Bankruptcy Court recognized that the circuit court cases and the Rule they embraced were relevant because they demonstrate the *factual* background and understanding during the 1980s with respect to drafting and negotiating indentures.[22]

The Senior Trustee accuses Judge Hillman of defying the First Circuit's instruction that the Rule of Explicitness is a "dead letter" (ST Brief at 3, 27-31), but Judge Hillman's factual findings concerning how subordination provisions were drafted and understood during the 1980s is completely different from application of the Rule as a *per se* rule. The First Circuit itself recognized this distinction. In holding that the Rule of Explicitness could not be applied as a *per se* rule, the First Circuit nonetheless took care to note that "the backdrop of bankruptcy may inform the [factual] examination into the parties' intent." *Bank of New England Corp.*, 364 F.3d at 368 n.5.

The First Circuit also observed (and Judge Hillman agreed) that this backdrop should necessarily be considered with any other factual evidence concerning the intent or expectations of the parties.[23] Simply because the First Circuit determined, in 2004, that the Rule of Explicitness was abrogated by the Bankruptcy Code does not change the fact that participants

---

Bankruptcy § 510(a). *See First Fidelity Bank v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528, 533-34 (Bankr. S.D.N.Y. 1991) ("[T]his Court concludes that *Kingsboro* retains its vitality and remains the controlling law in the Second Circuit.").

[22]     The Senior Trustee takes issue with the Bankruptcy Court's statement that the language in the indentures in the *Kingsboro Mortgage* case was "identical to that now before the [Bankruptcy Court]." (ST Brief at 34-35.) While the two subordination provisions are not word-for-word the same, they are functionally identical in that they were both found to be ambiguous in their treatment of post-petition interest.

[23]     *See* 364 F.3d at 368 n.5; Intent Decision at 27 (noting that the legal backdrop "only sets the stage for further inquiry").

in the debt securities market in the 1980s understood and expected that subordination provisions

would be interpreted according to the Rule.

      **2.      Model Indentures and Scholarly Publications from the 1980s Established that Practitioners and Academic Commentators Understood the Rule of Explicitness to be in Effect.**

As Mr. Gadsden testified, the 1983 Model Indenture — the most recent version at

the time the Junior Indentures were drafted — reflected the market's adoption of the convention

of using explicit language to convey the right to post-petition interest to senior debtholders when

that was the intended result.  (ST App. Ex. 8 (11/18/08) at 120:5–121:15.)  The subordination

provisions in the 1983 Model Indenture conspicuously included language to provide the drafters

of indentures with the option if they wished to convey the right to post-petition interest:

> Upon any distribution to creditors of the Company . . . in a bankruptcy . . .
> (1) holders of Senior Debt shall be entitled to receive payment in full in
> cash of the principal of and interest (*including interest accruing after the
> commencement of any such proceeding*). . . .

(ST App. Ex. 12 at 769; emphasis added.)  Further, the Notes to the subordination provisions

further clarify that the new subordination provisions in the 1983 Model Indenture included

language that, if utilized, would provide for post-petition interest in the subordination

entitlements of senior debt.  (*Id*. at 809:  "The Model Simplified Indenture specifies that priority

in right of payment will extend to interest accruing on Senior Debt even after the commencement

of a bankruptcy proceeding.")[24]

---

[24]      The ABA Committee explained:

> *Express* agreements to subordinate, such as the agreement set forth in this
> Section, furnish the basis for the contractual subordination provided for in Article
> 11, have uniformly been enforced by the courts, and, by facilitating correct
> analysis of the contractual rights involved, help assure continuance of such
> enforcement.

(continued…)

By contrast, the 1971 ABF Model Indenture, predecessor to the 1983 Model Indenture, had used general language in its subordination provision — language that the circuit courts had deemed insufficient to encompass post-petition interest. (JT App. Ex. 4 at 561.) Based on his examination of the Model Indentures and the testimony of Mr. Gadsden, Judge Hillman concluded that the language in the 1983 Model Indenture was an intentional departure from the 1971 ABF Model Indenture designed to address the rulings of the courts.[25] As Mr. Gadsden testified, the 1983 Model Indenture included the express language practitioners considered necessary for parties desiring the *option* of conveying post-petition interest to the holders of senior debt to use when the parties so intended. (ST App. Ex. 8 (11/18/08) at 117:14–118:24, 122:15–123:5.)[26] Without this language, it was understood that post-petition interest would not be covered by the subordination provision. (*Id*. at 133:12–134:1.)

There was no evidence that the market understanding changed following the adoption of Bankruptcy Code § 510(a) in 1978. Mr. Gadsden testified that, while he was aware of Section 510(a) during the 1980s, he did not understand it to have abrogated the Rule of Explicitness. (ST App. Ex. 8 (11/18/08) at 150:14–152:15.) To the contrary, Mr. Gadsden

---

(ST App. Ex. 12 at 808; emphasis added.) Thus, the 1983 Model Indenture clearly instructs that express reference to terms intended to fall within the ambit of subordination is required.

[25]    *See* Intent Decision at 44-45 (stating that the revised language in the 1983 Model Indenture was designed to provide language necessary to satisfy the Rule of Explicitness).

[26]    The Senior Trustee conflates the *desire* of some market participants (*i.e.*, primarily senior debt) to include post-petition interest within the purview of subordination clauses with *market expectation and understanding regarding what was needed to achieve that goal*. (ST Brief at 25, 48-49.) Taking Mr. Gadsden's words out of context, the Senior Trustee mischaracterizes them as an unequivocal statement by Mr. Gadsden that *all* (or effectively all) participants in the debt securities markets intended that senior noteholders receive post-petition interest out of distributions to junior noteholders. (*Id*. at 48-49.) To the contrary, Mr. Gadsden testified that market participants knew what the rules were — that you had to include an express reference to post-petition interest in the subordination provisions to deliver the recoveries *desired by senior creditors*. (ST App. Ex. 8, 11/18/08, 118:10-24.)

testified that, when parties intended to subordinate junior creditors to post-petition interest on senior debt, "people drafting indentures continued to include explicit language in indentures in order to reach that goal." The 1983 Model Indenture confirms his testimony.[27]    (*Id*. at 151:13-15.)

The Junior Trustees introduced seven scholarly articles and practice guides written in the 1980s that also corroborated Mr. Gadsden's testimony. All discussed the need for an explicit reference to post-petition interest in subordination agreements if the holders of senior debt were to receive post-petition interest. (JT App. Exs. 5-11.) For example, one article published as late as 1987 cautioned that "it is important that senior creditors include in contractual subordination agreements an express right to receive post-petition interest, before any payments are made to the junior creditors." (JT App. Ex. 5 at 273-74.)[28]

---

[27]    The *Southeast Banking* courts also found that the market had adjusted to the Rule of Explicitness. *See Southeast Banking Corp.*, 93 N.Y.2d at 184 ("[p]arties to subordination agreements undoubtedly relied on the Rule – their lawyers would have been quite remiss had they not – since recent case law as well as a leading authority and many commentators have consistently recognized the continued vitality of the Rule."); *see also Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1124-25 (11th Cir. 1998) (majority opinion: "[W]e wonder whether the New York courts would disturb the heretofore uniform treatment of this question, particularly given the evidence that the capital markets appear to have adjusted to the Rule of Explicitness."); *Id*. at 1127 (dissenting opinion:  Rule of Explicitness "was well known and accepted by those in the financial world").

[28]    These articles make clear that market understanding regarding the need for specific reference to post-petition interest remained unaltered after the enactment of Bankruptcy Code § 510(a).  *See* JT App. Ex. 6 at 7-8 (stating that it remained unclear whether the holders of senior debt would be entitled to post-petition interest even if the subordination provisions explicitly provided for it); JT App. Ex. 7 at 322-23 (stating that a specific reference to "postpetition interest" should be included in indentures); JT App. Ex. 8 at 974 (stating that "[i]f senior debt is to include interest . . . even if accrued or incurred post-petition and even though the estate is insolvent, the subordinated class must be clearly put on notice of this fact"); JT App. Ex. 9 at *7-8 (stating that subordination provisions should make clear whether senior debt includes post-petition interest); JT App. Ex. 10 at 373 (stating that "Courts have held that unless the subordination provisions expressly include postpetition interest as senior debt, the subordination provisions will not entitle the senior creditors to any postpetition interest payable to the junior creditors"); JT App. Ex. 11 at 26 (same).

All of this evidence demonstrates that in the 1980s, the legal and financial markets understood that explicit language was required if the holders of senior debt were to recover post-petition interest.

### 3.    The Bankruptcy Court's Finding that Investment Bankers in the 1980s Expected that Interest Would Cease Upon Bankruptcy is Well-Supported by the Record.

At trial, both sides offered expert testimony from investment bankers, whom the Court found to be "prime mover[s] in the issuance of debentures." (*See* Intent Decision at 36.) The Bankruptcy Court heard live testimony from two investment banking experts: Gilbert I. Matthews, who testified on behalf of the Junior Trustees, and William H. Purcell, who testified on behalf of the Senior Trustee.

Mr. Matthews has more than 40 years of experience in investment banking, primarily with subordinated or convertible debt issues. (*See* Intent Decision at 41-42.) He testified that investment bankers in the 1980s understood that junior creditors were subordinate only to the extent of the issuer's obligations under the subordination language used in the Junior Indentures.[29] (ST App. Ex. 8 (11/18/08) at 42:24–43:11.) And investment bankers understood that "it was common knowledge in the industry that interest ceased upon the filing of a [bankruptcy] petition."[30] (*Id.* at 42:24–43:11.) Mr. Matthews testified that the terms "paid in

---

[29]    The Junior Indentures are clear on this point:

> [T]he obligations of [BNEC] to make any payment on account of the principal of and interest on each and all of the [Subordinated Notes] shall be subordinate and junior, to the extent and in the manner hereinafter set forth, in right of payment *to [BNEC's] obligations to the holders of Senior Indebtedness.*

(ST App. Ex. 1 at ¶¶ 40-41; emphasis added.)

[30]    Senior debt holders as well as investment bankers had this understanding; Mr. Matthews recalled that senior debt holders in the 1980s would often seek to prevent a troubled issuer from filing for (continued…)

23

full" or "interest due or to become due" — the words used in the Junior Indentures — would not have been understood to indicate any exception to this general rule. (*Id.* at 48:10–49:11, 49:25–50:7.) Thus, investment bankers understood that in the context of a bankruptcy filing by an insolvent debtor, senior creditors were "paid in full when [they] received the amount owed as of the petition date." (*See* Intent Decision at 42; *see also* ST App. Ex. 8 (11/18/08) at 41:7-18.)[31]

Furthermore, Mr. Matthews testified that the negotiators of subordinated indentures had no reason to bargain for a different result. As he testified, the parties that negotiated the business terms of a subordinated indenture were the issuer and the underwriters — most often (and unquestionably the case here), no senior debt holders participate in the negotiation of the subordinated indentures. (ST App. Ex. 8 (11/18/08) at 44:19–45:24.)

As Mr. Matthews testified, underwriters have an affirmative interest in obtaining terms favorable to the junior note holders — which would include subordination provisions that do not encompass post-petition interest — to whom they market the subordinated debt. (ST App. Ex. 8 (11/18/08) at 45:4-15.) Likewise, the issuer has no interest in making the subordination provisions broader or more inclusive than necessary. *Id.* Indeed, where — as here — the senior indentures do not require the company to include post-petition interest in subordination clauses, it is in the company's best interest to agree to terms that are more favorable to the holders of junior debt so that the debt is more easily marketed and sold. (*Id.* at 46:4-18; *see generally* ST App. Exs. 2-4.) Thus, as Mr. Matthews testified, none of the parties

---

bankruptcy, because the filing would halt the accrual of interest. (ST App. Ex. 8 (11/18/08) at 50:8–51:6.)

[31]    Mr. Matthews also testified that investment bankers understood the term interest "due" to mean interest due as of the scheduled payment date and that the term "to become due" generally refers to interest earned between the last scheduled payment date up to the petition date. (ST App. Ex. 8 (11/18/08) at 49:2-11, 49:25–50:7.) *See also* 11 U.S.C. § 502(b)(2).

actually involved in negotiating and drafting subordinated indentures — the parties whose intent is relevant to interpreting the contracts — "has an incentive to make the subordination any stronger than is required." (ST App. Ex. 8 (11/18/08) at 45:4-15.)

The Senior Trustee presented testimony from its own investment banking expert, William H. Purcell. Mr. Purcell testified that, in his view, senior noteholders are *always* entitled to collect post-petition interest from junior noteholders, *regardless of the language of the applicable indentures*. (*See* Intent Decision at 42-43.) From Mr. Purcell's point of view, it made no difference at all whether subordination provisions used the phrase "paid in full," "interest due or to become due," or "including interest accruing after bankruptcy." (ST App. Ex. 8 (11/17/08) at 81:23–83:2.) Mr. Purcell testified that all subordination provisions — no matter how differently worded — are essentially synonyms, having the identical effect of entitling senior noteholders to post-petition interest. *Id.* After considering Mr. Purcell's testimony at some length, Judge Hillman concluded that Mr. Purcell was simply "not credible" because, *inter alia*, his testimony disregarded any applicable law and ignored the basic rule of contract construction that "words have meaning."[32] (*See* Intent Decision. at 36-43.)

---

[32]    Mr. Purcell relied, in part, on a footnote in a law review article written by David Gray Carlson entitled "*A Theory of Contractual Debt Subordination and Lien Priority,*" 38 Vand. L. Rev. 975, 988 n.41 (1985) (ST App. Ex. 15), in which Professor Carlson criticizes the circuit court decisions giving rise to the Rule of Explicitness and posits that the 1983 Model Indenture reflects market expectations. (ST App. Ex. 14.) In light of the weight of authority to the contrary (*see supra*, n.28) and Mr. Gadsden's testimony on this subject, the Bankruptcy Court correctly discounted the Carlson article (and Mr. Purcell's reliance thereon) as nothing more than an uncorroborated conclusion that the 1983 revisions to the model indenture (to include explicit language) reflected market expectations that senior debt always expect to receive post-petition interest before junior debt is paid. (Intent Decision at 41 & n.24.)

Although Professor Carlson disagreed with the three circuit court cases establishing the Rule of Explicitness as a policy matter (ST App. Ex. 14 at 987 n.41), neither the Carlson article nor another law review article by Mark Roe, *Commentary "On the Nature of Bankruptcy: Bankruptcy, Priority and Economics,"* 75 Va. L. Rev. 219 (1989) (ST App. Ex. 15), question the vitality of the three circuit court cases. The Roe article, which was not published until 1989 — long after the subordination language in (continued…)

Judge Hillman's finding that investment bankers expected the senior debt's right to interest to cease upon bankruptcy for purposes of subordination flowed directly from his assessment of the credibility of Mr. Matthews and Mr. Purcell, and should not be disturbed.

### 4. The Contemporaneous Transactional Evidence Presented Was Consistent With the Expert Testimony

#### (a) John Cashin, Who Executed the 1989 Junior Indenture, Understood the Subordination Provisions Not To Include Post-Petition Interest

The only direct evidence at the trial regarding the intent of the parties to the Junior Indentures was the testimony of John Cashin, the senior trust officer who headed the trust department at Chemical Bank Delaware (the original indenture trustee under the 1989 Junior Indenture) and who executed the 1989 Junior Indenture on behalf of the indenture trustee. (JT App. Ex. 12 at 15:13–16:7, 31:20–32:3; *see also* ST App. Ex. 7 at 82.) Mr. Cashin reviewed at least four drafts of the 1989 Junior Indenture, and reviewed it entirely. (JT App. Ex. 12 at 30:20–31:4, 28:24–29:20.)

As he testified, Mr. Cashin's expectation was that "interest and principal due . . . up to and including [the] petition [date], but not postpetition interest, would be due to the senior holders before disbursement would be made to the subordinated holders." (*Id*. at 53:1–54:9.) Mr. Cashin further testified that if the subordination provisions were in fact intended to include post-petition interest, he would have expected that this term would have been disclosed to

---

the Junior Indentures was fixed ― merely queries in a footnote whether these cases were consistent with Bankruptcy Code § 510(a). (*See* ST App. 15 at 237 n.48.)

prospective purchasers in the indenture and related prospectus because this "would be the exception . . . rather than the norm."[33]  (*Id*. at 53:12-21, 55:13-22, 57:2-8, 58:5-9.)

Mr. Cashin's testimony belies the Senior Trustee's claim that the Bankruptcy Court found no illuminating direct or indirect evidence.  His testimony was the only direct testimony of intent presented by either side at trial.

> **(b)    The Documentary Evidence Supported the Conclusion that Law Firms Drafting the Junior Indentures Did Not Intend to Include Post-Petition Interest in the Senior Note Holders' Subordination Entitlements.**

The Junior Indentures were drafted by lawyers representing the issuer, BNEC, and the investment bankers underwriting the subordinated debt issues.[34]  Davis Polk & Wardwell LLP ("Davis Polk"), which represented the underwriters as well as Morgan Guaranty (the original indenture trustee under both the 1984 and 1987 Junior Indentures),[35] had primary responsibility for drafting the 1987 Junior Indenture and participated in the preparation of the

---

[33]    None of the relevant documents – the 9 7/8% Subordinated Notes, the 1989 Junior Indenture, or the prospectus filed with the Securities and Exchange Commission (the "SEC") in connection with the registration and sale of the 1989 Subordinated Notes – contain such disclosures.  (*See* JT App. Ex. 13; ST App. Ex. 7; JT App. Exs. 14-16.)  All of the other Junior Indentures and Senior Indentures at issue in this case are similarly bereft of any reference to interest accruing after a bankruptcy proceeding, whether in the definition of Senior Indebtedness, in the subordination provisions of the Junior Indentures, or in any discussion thereof in the registration materials.  (*See* ST App. Exs. 2-7.)  Finally, Mr. Cashin testified that no one involved in the negotiations indicated that payment of the 9 7/8% Subordinated Notes would be subordinated to the payment of post-petition interest on Senior Notes.  (JT App. Ex. 12 at 57:20–58:4.)

[34]    This is typically the case.  Both of the investment banking experts that testified at trial agreed that investment bankers rely upon the lawyers to draft indentures.  (ST App. Ex. 8 (11/17/08) at 72:9-15; ST App. Ex. 8 (11/18/08) at 44:17–45:3.)  The Senior Trustee also acknowledged that the understanding of the lawyers, as drafters of the Junior Indentures, is of paramount importance.  (*See* ST Pre-Trial Br. at 15: "The best evidence of the intent underlying the subordination provisions would have been the communicated intent of the law firms that drafted the Junior Indentures . . . ").

[35]    Davis Polk was (a) counsel to Morgan Guaranty in connection with the 1984 Junior Indenture and the 1987 Junior Indenture, and (b) counsel to the underwriters in connection with the 1987 Junior Indenture and the 1989 Junior Indenture.  (ST App. Ex. 1 at ¶ 22.)

1989 Junior Indenture.  (ST App. Ex. 1 at ¶ 22; JT App. Ex. 17 at 11:2–11:7, 35:23–36:8, 37:18-

24.)

   In 1977, Davis Polk attorneys prepared a Manual for Lawyers Reviewing Trust

Indentures for Morgan Guaranty Trust Company of New York (the "DPW Manual").  (JT App.

Ex. 18.)  The DPW Manual describes itself as a "working reference" for Davis Polk lawyers,

based on Davis Polk's "expertise, gained from experience working with [its] clients in each of []

three categories:" underwriters, indenture trustees and issuers.  (*Id.* at USBNA003253.)  The firm

used the DPW Manual during the 1980s both to train its own attorneys and to assist in the

education of its client Morgan Guaranty (the original indenture trustee under the 1984 and 1987

Junior Indentures).    The DPW Manual was provided to numerous individuals at Morgan

Guaranty, including Richard Sparrow, the account officer who signed the 1984 Junior Indenture.

(ST App. Ex. 5 at 88; ST App. Ex. 8 (11/18/08) at 87:3-5, 11-24, 90:11-14, 92:7-10, 98:14-23.)

Morgan Guaranty, in turn, used the DPW Manual to train its corporate trust administrators, and

as a general reference in the 1980s.  (ST App. Ex. 8 (11/18/08) at 87:25–88:22.)

   The DPW Manual contains an extensive analysis of how courts had construed

non-explicit subordination language in disputes over post-petition interest, stating that:

> 4. Subordination to Post-Petition Interest.  Typical
> subordination language provides that no payments may be made in respect
> of subordinated debt unless and until all principal and interest is paid on
> senior debt.  In three bankruptcy cases, the Second, Third and Tenth
> Circuits have held conventional drafting insufficient to preserve the right
> of the senior debt to receive post-bankruptcy interest out of amounts
> otherwise payable to junior debt.  This is good for junior debt and bad for
> senior debt.

(JT App. Ex. 18 at USBNA003339-40; citations omitted.)  The DPW Manual summarizes the

reasoning in each of the circuit court cases, quoting the Third Circuit's directive that "If a

[senior] creditor desires to establish a right to post-petition interest . . . the agreement *should*

*clearly show* . . . that superior creditors may be entitled to interest up to the date of actual distribution." (*Id.* at USBNA003340; emphasis added.)

The DPW Manual then prescribes explicit language for inclusion by lawyers representing senior debt that would meet this requirement, stating:

> Following these instructions of the court, then, lawyers representing senior debt may wish to add (INCLUDING WITHOUT LIMITATION, EXCEPT TO THE EXTENT, IF ANY, PROHIBITED BY MANDATORY PROVISIONS OF LAW, POST-PETITION INTEREST IN ANY BANKRUPTCY, ARRANGEMENT, REORGANIZATION OR SIMILAR PROCEEDING) to all appropriate parts of subordination agreements (and subordinated securities themselves.")

(*Id.* at USBNA003339-42; emphasis in the original; footnote and citations omitted.)  Davis Polk's instruction on the need for explicit language to entitle senior debt to post-petition interest was unequivocal.

The DPW Manual's instructions concerning subordination provisions remained unaltered through the 1980s, and indicate that Davis Polk and Morgan Guaranty both understood that subordination provisions lacking the sort of explicit reference that the DPW Manual prescribed would not afford the holders of senior notes a priority in payment of post-petition interest claims.  Lawyers from Wachtell, Lipton, Rosen & Katz ("Wachtell"), counsel to BNEC in connection with the 1987 and 1989 Junior Indentures, similarly had sample explicit language regarding post-petition interest available to them when drafting the 1987 Junior Indenture, but did not include such language in the Junior Indentures.[36]

---

[36]    Wachtell, representing BNEC as issuer (see ST App. Ex. 1 at ¶ 21), had primary responsibility for drafting the 1989 Junior Indenture and participated in the drafting of the 1987 Junior Indenture.  (ST App. Ex. 1 at ¶ 21; JT App. Ex. 17 at 37:18-24.)  The SEC requested that the prospectus for the 8 3/4% Subordinated Capital Notes disclose the treatment of these securities vis-à-vis general unsecured creditors.  (JT App. Ex. 19 at WL 0684.) Wachtell, on behalf of BNEC, responded to this request for greater specificity by letter, attaching the subordination provisions of a First Interstate prospectus and (continued…)

The Senior Trustee mischaracterizes the Bankruptcy Court's evaluation of this transactional evidence, arguing that the Bankruptcy Court dismissed this evidence as having no value.  (ST Brief at 23-24, 35.)    That is not the case.[37]    Judge Hillman considered all of this evidence.  Although he concluded that the direct transactional evidence was not *independently* conclusive on the question of the parties' intent,[38] it nevertheless added to the cumulative body of facts and circumstances that Judge Hillman considered in reaching his ultimate decision.  Indeed, he undoubtedly had this transactional evidence in mind when he noted that:

> To say that an attorney at a major firm, drafting documents in a multi-million dollar transaction, would ignore three circuit court decisions which (to the best of then knowledge) had a direct impact on an issue involved in the drafting, defies belief.

(*See* Intent Decision at 44.)

After considering all of the evidence, Judge Hillman found that a reasonable drafter of the Junior Indentures would have assumed that the Senior Note holders' subordination rights were limited to the Senior Note holders' entitlement as a matter of law — which did not include post-petition interest.  (Intent Decision at 43.)    Furthermore, the drafter would have

---

marking the language it intended to adopt to explain the ranking of the subordinated securities with respect to creditors who did not hold Senior Indebtedness.  (*Id*. at WL 0687-88.)  Significantly, the subordination provisions of the First Interstate prospectus also contained explicit language stating that the subordination extended to "interest accruing subsequent to the commencement of any proceeding for the bankruptcy or reorganization of the Corporation . . . ."  (*Id*. at WL 0688.)  Wachtell could have used such explicit language in the 1987 Junior Indenture and related documents to provide post-petition interest to the holders of Senior Notes, if the parties intended to do so.

[37]    The Bankruptcy Court acknowledged that the DPW Manual suggested the existence of "institutional knowledge at Davis Polk with respect to the Rule of Explicitness."  (*See* Intent Decision at 34.)  The Senior Trustee's own expert, Mr. Purcell, reached the same conclusion.  When asked whether he believed lawyers involved in drafting the Junior Indentures were aware of the three circuit court cases, Mr. Purcell responded: "Well, as lawyers individually, I can't answer that, but obviously the famous Davis Palk manual is one of the pieces of evidence in this case, and Davis Polk was counsel for the underwriters.  So as an institution, I'd have to say, yes."  (ST App. Ex. 8 (11/17/08) at 86:10-16.)

[38]    *See* Intent Decision at 34 ("I must cast my net wider.")

considered the three circuit court decisions that were understood at the time to bear directly on

the drafting of the Junior Indentures, and to require the use of explicit language in order to

convey post-petition interest.  (*Id*. at 44.)  Given this, the Bankruptcy Court found as a factual

matter that "the drafter of the Junior Indentures, had he or she wished to expand the

subordination to include post-petition interest, would have added explicit language to accomplish

that end."[39]  (*Id*. at 2, 49.)  This finding is well-supported by the voluminous extrinsic evidence,

and cannot be considered clear error.

**B.**    **The Bankruptcy Court Adhered to General Legal Principles, and Did Not Read a Bankruptcy-Specific Rule of Explicitness Into New York Law.**

Judge Hillman did not, as argued by the Senior Trustee, read a bankruptcy-

specific rule of explicitness into New York law.  Instead, following the directive of the First

Circuit, he applied basic principles of New York law in reaching factual determinations.

Under well-established New York law, contracts are construed in the light of the

law in effect at the time they were drafted.  In remanding, the First Circuit acknowledged this,

and instructed that "[t]o be sure, the backdrop of bankruptcy may inform the examination into

the parties' intent" because of the "presumption 'that the parties had [the law in force at the time

of agreement] in contemplation when the contract was made' and that the 'contract generally will

be 'construed in light of such law.'"  *Bank of New England Corp.*, 364 F.3d at 368 n.5 (quoting

---

[39]    Relying on a footnote in the Intent Decision (in which Judge Hillman notes that indentures prepared in the 1980s did not uniformly include explicit language) the Senior Trustee argues that there was "no illuminating direct or indirect evidence" of the parties' intent and the Junior Indentures should be construed as a matter of law.  (ST Brief at 35.)  The Senior Trustee's contention is belied by the remainder of the Intent Decision in which Judge Hillman devotes over 20 pages to discussing the evidence that convinced him that the drafters of the Junior Indentures did not intend to include post-petition interest in the subordination obligations of Junior Note holders.  (Intent Decision at 28-49.)

*Dolman*, 2 N.Y.2d at 116); *see also* 22 N.Y. Jur. 2d *Contracts* § 228.  New York courts have explained that such law "becomes as much a part of the agreement as though it were expressed or referred to therein."  *Dolman*, 2 N.Y.2d at 116.  Consequently, the terms and provisions in the agreement will be presumed to carry the meaning that best coheres with the relevant law.

The purpose of the rule (as with most other rules of construction and contractual defaults) is to effectuate the intent of the parties as nearly as possible.  *See Skandia America Reinsurance Co. v. Schenck*, 441 F. Supp. 715, 723-24 (S.D.N.Y. 1977).[40]  Accordingly, the presumption has no effect if there is specific language in the agreement indicating that it should not be construed in the light of existing law.  *See Dinerman v. Nat'l Bank of North America*, 390 N.Y.S.2d 1002, 1006  (Sup. Ct. 1977) (stating that law in force at the time is presumed to be incorporated "unless a contract *specifically* provides otherwise." (emphasis added)).  Failing express language, the presumption also can be rebutted by coming forward with evidence that conclusively establishes that the parties intended a different and independent meaning.  *See Time Warner Entm't Co. v. Brustowsky*, 634 N.Y.S.2d 82, 82-83 (1st Dept. 1995) (regulatory definition of "hazardous substances" was not determinative of its meaning when evidence at trial established that contracting parties intended an independent meaning).

---

[40]     The admonition that "contracts will be construed in light of such law" reflects a recognition that parties do not draft agreements in a vacuum.  *See Skandia*, 441 F. Supp. at 724 (citing *Dolman*, 2 N.Y.2d at 116).  The understanding of the parties regarding the effect that the inclusion or omission of particular terms and provisions will have on their rights and obligations is necessarily informed by the manner in which those terms and provisions have previously been construed and enforced by courts.  Indeed, parties rely on judicial interpretation of contractual terms to ensure that written instruments adequately provide for the enforceability of rights and interests that they wish to protect in their dealings with others.  *See Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541-42 (S.D.N.Y. 1983) (prior decision interpreting redemption provision informed parties' reasonable expectations as to how such language would be construed in the future); *Ott v. Ott*, 698 N.Y.S.2d 137, 138 (4th Dept. 1999) ("It is presumed that an agreement that is prepared by attorneys is drawn with reference to applicable law.") (internal quotations omitted).

The application of this principle therefore involves two steps:  *First*, the court must determine whether the contract contains language specifically stating that its provisions are not intended to incorporate otherwise applicable substantive law.  *Second*, assuming the agreement contains no such language, the court must allow a party seeking to rebut the presumption to introduce available extrinsic evidence in an effort to demonstrate that the parties intended a meaning contrary to that arising from applicable law.

In observing that the rule "appears to function as a 'principle of explicitness'" (Intent Decision at 21), Judge Hillman simply recognized that, under New York law, one way to rebut the presumption is to provide express language in the agreement that makes clear that the parties do not intend to incorporate applicable law with respect to a particular term.  Otherwise, they risk facing the potentially onerous burden of rebutting the presumption with extrinsic evidence of their intent.

The Senior Trustee seizes upon this phrase, arguing that Judge Hillman reincarnated the Rule of Explicitness, which he applied after pretending to listen to evidence on intent.  (ST Brief at 2-6, 22-26.)  But the phrase "principle of explicitness," coined by Judge Hillman to describe one way to rebut the presumption, bears no legal similarity to the Rule of Explicitness.[41]  The Rule of Explicitness was a *per se* rule that applied specifically and exclusively to the issue of whether the language of a subordination agreement made explicit reference to post-petition interest.  The *per se* Rule was used to determine the scope of subordination without any factual inquiry into the parties' intent, and rendered such an inquiry unnecessary.  By contrast, the New York rule of contract construction highlighted by the First

---

[41]    For all its fervor, the Senior Trustee's argument appears to ultimately be grounded in the fact that both phrases use the word "explicitness," but beyond that has no analytical substance.

Circuit and applied by the Bankruptcy Court is a general principle of construction that may be applied to *any* type of agreement and with respect to *any* genre of substantive law that has a bearing on the meaning of that agreement.[42]  It is an ancient and well-established rule of New York contract construction that can be used to frame a court's analysis of the parties' intent with a factual presumption that they imported existing law when preparing their agreement.

The Senior Trustee also argues that the First Circuit had already decided that there was no "principle of explicitness" under New York law.  (ST Brief at 22, 29.)  This contention is wholly inconsistent with the First Circuit's instructions to the Bankruptcy Court to conduct a fact finding inquiry in the light of this tenet of New York law.[43]  The First Circuit issued no such ruling.[44]  For his own part, Judge Hillman was crystal-clear in acknowledging that he was bound by the First Circuit's determination that "the Rule of Explicitness in its classic form," that is, as a

---

[42]    For example, the principle of incorporation could be applied in interpreting a divorce agreement, to create the presumption that the parties intended references to "minor children" to be interpreted consistently with the statutory definition of that term.  This application does not mean that the principle of incorporation is a family law-specific rule.  Neither does it become a bankruptcy-specific principle when it is applied to create the presumption that parties to a subordination agreement intended that the measure of the interest that had to be paid out of junior distributions in the event of bankruptcy would be limited by applicable law stating that such interest ceased running upon the filing of a bankruptcy petition.

[43]    The Senior Trustee latches on to a section of the Intent Decision where the Bankruptcy Court considers whether the First Circuit decision addressed the scope or application of the presumption under New York law.  (ST Brief at 27; Intent Decision at 21-22.)  Although the Bankruptcy Court framed the issue in terms of the distinction between holding and dicta, it ultimately concluded that the First Circuit's opinion only barred application of the Rule of Explicitness itself, and left to the Bankruptcy Court application of the principle of incorporation of law in this case.  Intent Decision at 21-22; *see also Bank of New England Corp.*, 364 F.3d at 368 n.5 ("Here, however, the effect of that tenet is uncertain absent further factfinding.").

[44]    Nor did the First Circuit reject the *Pavone* case, relied upon, in part, by Judge Hillman in determining the substantive New York law he presumed to be incorporated into the Junior Indentures, as the Senior Trustee argues.  (ST Brief at 29-30.)  *First*, *Pavone* is not discussed at all in the First Circuit opinion.  *Second*, as the Intent Decision makes clear, Judge Hillman simply recognized that under both New York common law (including, but not limited to, *Pavone*) and federal bankruptcy law, interest on unsecured debt ceases upon the commencement of an insolvency proceeding.  (Intent Decision at 43.) The result is the same regardless of which law is incorporated.

bankruptcy-specific bright line rule for interpreting subordination agreements, had been abrogated as of 1978.  (*See* Intent Decision at 22.)

To carry out the First Circuit's mandate, Judge Hillman first identified the substantive law in effect at the time.  He examined principles of New York law, from their origins in Blackstone forward, and determined that the substantive law of New York in effect at the time the indentures were drafted was that "interest on an obligation ceases upon the filing of an insolvency proceeding of whatever nature by the obligor."[45]  (*See* Intent Decision at 26.) Applying the principle of incorporation of law, Judge Hillman next examined the language of the Junior Indentures, and concluded that "the subordination agreements do not provide otherwise, forming a presumption that drafters did not intend for the payment of interest accruing after the commencement of an insolvency proceeding."  (*Id*. at 27.)

After discussing the factual presumption, Judge Hillman then proceeded to engage in "differential fact finding," reviewing, weighing and evaluating the testimony and evidence received during the trial.  (*See* Intent Decision at 17, 27-49.)  He found the Junior Trustees' testimonial and documentary evidence credible and persuasive in demonstrating that the parties

---

[45]    In applying this tenet, the Bankruptcy Court relied primarily on New York common law providing for the cessation of interest on unsecured claims after insolvency proceedings are commenced. It would also be correct to incorporate Bankruptcy Code § 502(b)(2), which provides for the disallowance of interest accruing on unsecured claims following the filing of a bankruptcy proceeding.  *Cf. 2 Tudor City Place Assoc. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) (deeming lease to have incorporated federal statute governing condominium developments); *Bridge Capital Investors, II v. Susquehanna Radio Corp.*, 458 F.3d 1212, 1218 (11th Cir. 2006) (recognizing propriety under New York law of construing contract in the light of FCC rulings); *Brown v. Utica Mut. Ins. Co.*, 53 N.Y.S.2d 760 (Sup. Ct. 1945) (construing contract in the light of federal employment law).  The Bankruptcy Court recognized that cessation of post-petition interest on unsecured claims following a bankruptcy filing likewise was mandated by federal bankruptcy law.  (*See* Intent Decision at 43: "It would have been entirely reasonable for the drafter to assume that the debt to which the Junior Indentures were to be subordinated was the debt to which the Senior Indenture holders would be entitled [] as a matter of law, the common law of New York or federal law if the proceedings were in bankruptcy.")

to the Junior Indentures did not intend to encompass post-petition interest in the subordination provisions, and that the only evidence to the contrary adduced by the Senior Trustee was "not credible." (*Id*. at 42.)

The Senior Trustee's accusation that the Intent Decision subverts the First Circuit's decision by applying the Rule of Explicitness is baseless. In applying well-settled rules regarding the incorporation of law, Judge Hillman made very clear that he was not applying a *per se* rule of any kind. He recognized that the presumption is part of the larger factual inquiry into the parties' intent, and "only sets the stage for further inquiry and by no means relieves [the Court] of [its] obligation to conduct 'a contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances.'" (Intent Decision at 27.) The Senior Trustee's contention that the Bankruptcy Court committed a legal error in framing its analysis as the First Circuit instructed is without merit.

## II.    THE SENIOR TRUSTEE HAS NOT IDENTIFIED ANY ERRORS OF LAW COMMITTED BY THE BANKRUPTCY COURT.

In its continuing effort to manufacture an error of law subject to *de novo* review, the Senior Trustee argues that Judge Hillman failed to resolve the meaning of the language at issue, misunderstood the ambiguity in the Junior Indentures, should have adopted the Senior Trustee's interpretation of the Junior Indentures as a matter of law, ignored the treatment of allegedly analogous agreements, and failed to construe the Junior Indentures against the Junior Trustees under principles of *contra proferentem*. All of these contentions are meritless.

### A.    The Bankruptcy Court Properly Construed the Phrase "Due or to Become Due" Under New York's General Contract Law.

The Senior Trustee argues that the Bankruptcy Court failed to construe the ambiguous phrase "due or to become due" in the Junior Indentures. (ST Brief at 34-35.) This completely mischaracterizes Judge Hillman's decision. The Bankruptcy Court recognized — as

the First Circuit had — that the subordinations provisions taken as a whole were ambiguous.

Consistent with the First Circuit's decision, the Bankruptcy Court started from the premise that

the subordination provisions were susceptible to two different meanings:

> All of the decisions relevant to the issues before me are based upon the agreement that the phrases "due or to become due" and "paid in full" are ambiguous.[46]  Although not stated in so many words, the concept universally accepted is that there is an underlying issue of "due *from whom*" or "paid in full *by whom*."  Taking a general look at the language at issue, there are two possible readings: either the subordination is satisfied because the senior has received all that it will ever receive from the debtor, and hence there is no obligation to which the subordination applies, or, the junior having agreed to subordinate until the senior has received full payment (it matters not from whom), the junior's subordination remains in force and sums otherwise payable to the junior must be turned over to the senior.

(*See* Intent Decision at 20; emphases in original.)   In other words, the Bankruptcy Court

understood the issue to be as the First Circuit described — whether the language in question

limited the measure of the subordination obligations to the Debtor's obligations, or whether it

instead provided for an independent measure that would include post-petition interest.[47]

---

[46]    The Senior Trustee omits this first sentence from its quote of the Intent Decision. (*See* ST Brief at 22.)

[47]    The Senior Trustee states that the Bankruptcy Court "wrestled" the question of "from whom would the payment to the Senior Debt, in the form of 'interest due or to become due,' come []."  It then contends that this question can be answered by reference to the turnover provisions in Section 12.03 of the Junior Indentures, which it argues have a plain meaning.  (ST Brief at 20.)  These contentions mischaracterize both the Bankruptcy Court's decision and the provisions of the Junior Indentures.  *First*, Judge Hillman is a seasoned bankruptcy judge who is well acquainted with the distribution priorities created by subordination agreements.  The ambiguity discussed by the Bankruptcy Court in this passage of the Intent Decision related to determining the *measure of  the subordination obligation* under Section 12.03 of the Junior Indentures, not from whom payment was due.  (Intent Decision at 19-20.)  *Second*, the turnover provisions in the second paragraph of Section 12.03 of the Junior Indentures do not answer the question the Senior Trustee creates — the Junior Trustees have turnover obligations only to the extent that distributions are made to them in violation of the subordination rights of the Senior Note holders.  (ST App. Ex. 1 at ¶ 43.)  If there are no subordination rights with respect to post-petition interest, as the Bankruptcy Court has found, there are no turnover obligations.

The First Circuit instructed the Bankruptcy Court to resolve the ambiguity in the phrase "due or to become due" by determining the intent of the parties with respect to post-petition interest. *Bank of New England Corp.*, 364 F.3d at 367-68. Applying New York law, the Bankruptcy Court properly made a factual finding based on extrinsic evidence that the parties did not intend to include post-petition interest in the subordination provisions, which findings are well supported by the record. (*See* Intent Decision at 2, 27-49.)

**B.      The Senior Trustee's Proffered Interpretations of the Junior Indentures, as a Matter of Law, Do Not Withstand Scrutiny.**

The Bankruptcy Court resolved the ambiguity in the Junior Indentures by determining the parties' intent based on its review of ample extrinsic evidence as well as its assessment of witness credibility. Thus, it is neither necessary nor appropriate to interpret the Junior Indentures as a matter of law. The Senior Trustee's request that this Court ignore the extrinsic evidence and interpret the Junior Indentures as a matter of law[48] should be denied.

The Senior Trustee's proposed interpretation of the Junior Indentures would not pass muster even if the record were bereft of the extrinsic evidence that allowed the Bankruptcy Court to resolve the dispute through factual findings. The Senior Trustee borrows from the law of guarantees, and performs grammatical gymnastics in its efforts to support the position that the Junior Indentures carry a plain meaning that provides them with post-petition interest. Not only are these arguments without merit, they are completely at odds with the First Circuit's finding

---

[48]     In the face of a contractual ambiguity that extrinsic evidence cannot resolve — which is *not* the case here — courts will give ambiguous terms "a fair and reasonable meaning that includes consideration of not merely the literal language but whatever may be reasonably implied therefrom." 28 N.Y. PRAC. *Contract Law* § 9:3; *see also Messina v. Lufthansa German Airlines*, 47 N.Y.2d 111, 114-15 (1979) ("Initially, we observe that . . . the record itself offers no clue as to the subjective intent of the parties to the agreement. . . .  In such circumstances, words in a writing are ordinarily given the meaning which those to whom they are addressed would reasonably be expected to perceive.")(internal citations omitted).

that the subordination provisions are ambiguous and lack a plain meaning. *Bank of New England Corp.*, 364 F.3d at 368 ("[I]t is impossible to glean the parties' intent form the language and structure of the instruments alone."). That is the law of the case.

### 1. Case Law Relating to Guarantor Obligations Has No Bearing on This Case.

The Senior Trustee argues that since lenders are able to recover from *guarantors* contractual interest that accrues after the bankruptcy of the primary debtor, senior creditors should similarly be entitled to post-petition interest from subordinated creditors. But subordinated creditors are *not* guarantors, and subordination provisions in public indentures are not even remotely akin to guaranties. Subordination agreements create distinctly different legal rights and obligations than do guaranties, and there is no principle of contract interpretation that would permit the construction of one type of contract by reference to the treatment of other parties under fundamentally different kinds of contracts.

A guaranty is a promise to answer for the debt of another. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000) (citing 63 N.Y. Jur. 2d *Guaranty and Suretyship* § 2 (1987)). A guarantor is *personally* liable for the debt guaranteed and is obligated to pay that debt upon default by the primary obligor. *See, e.g.*, *Columbia Hosp. v. Hraska*, 338 N.Y.S.2d 527, 529 (Civ. Ct. N.Y. Cty. 1972); *see also FDIC v. Municipality of Ponce*, 904 F.2d 740, 744 (1st Cir. 1990); *In re Hawaii Daiichi-Kanko, Inc.*, 71 B.R. 176, 178 (Bankr. D. Haw. 1987). The continued accrual of interest against a guarantor stems from the guarantor's independent contractual obligation to be liable to the creditor for the sums owed by the primary debtor.[49]

---

[49]    The independent nature of a guarantor's liability for the debtor's underlying contractual obligations is a well-settled under New York law. *See, e.g.*, *Nat'l Fin. Co. v. Perez*, 663 N.Y.S.2d 852, 852 (1st Dept. 1997) (holding that personal guaranties were primary obligations as to which defenses to (continued…)

No such rule exists with respect to subordinated creditors. New York courts have construed subordination provisions to apply only insofar as the senior creditor has an enforceable claim against the primary debtor. *See State of Rio de Janiero v. E.H. Rollins & Sons, Inc.*, 64 N.Y.S.2d 230, 232-33 (Sup. Ct. 1946) (holding that a subordinated creditor was not required to turn over funds received in the debtor's reorganization to a senior creditor whose claim was barred by the statute of limitations), *aff'd*, 80 N.Y.S.2d 359 (1st Dep't 1948), *aff'd*, 299 N.Y. 363 (1949). Indeed, courts have repeatedly recognized that a subordinated creditor's obligations are markedly different from those of a guarantor. *See In re HRC Joint Venture*, 187 B.R. 202, 213 (Bankr. S.D. Ohio 1995) ("The rights of TIAA against the City conferred on TIAA by its subordination agreement do not constitute the City a guarantor of TIAA's claim against the debtor.").[50] A subordinated creditor does not become a guarantor of the debtor's obligations to the senior creditor, and has no obligation to pay the senior creditor out of its own funds immediately upon the debtor's default.[51]

_____

underlying promissory note were irrelevant); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Robert Christopher Assocs.*, 691 N.Y.S.2d 35, 43 (1st Dept. 1999) ("Ordinarily, a guaranty, even if contemporaneously executed, is considered a distinct obligation" and is not subject to "any defense, set-off or counterclaim" of primary debtor). Indeed, this independence is virtually always spelled out expressly in the language of the guaranty itself.

[50]    S*ee also Duryea v. Lohrke*, 121 N.Y.S. 138, 141 (1st Dept. 1910) (subordination to debt to another creditor did not constitute an assumption of that debt), *aff'd*, 202 N.Y. 562 (1911); *Terwilliger*, 206 F.3d at 246-47 (stock redemption agreement, which required defendants to ensure that the corporation had sufficient surplus from which to pay a note obligation – *i.e.*, by funding the corporation – while creating a personal contractual obligation on the part of defendants, did not make them guarantors of the note).

[51]    The obligation of the Junior Trustees to turn over to the Senior Trustee distributions made in violation of the subordination agreement does not render the holders of Junior Notes guarantors or impose a payment obligation on such parties, as the Senior Trustee argues. (*See* ST Brief at 32-34.) Turnover arises when a party receives property to which it is not entitled; it does not create indebtedness that must be paid out of the junior creditor's personal property.

Crucially, a guarantor can cause interest to cease accruing against it by honoring its personal obligation to pay the common creditor upon a default by the debtor. Thus, the policy concerns underlying the disallowance of post-petition interest under Bankruptcy Code § 502(b)(2) — to prevent creditors from suffering a disproportionate loss from delayed payments resulting from an operation of law that is not within their control — do not apply to guarantors. Because no similar mechanism for mitigating loss is available to subordinated creditors, however, these policy considerations are fully applicable. *See* COLLIER ON BANKRUPTCY, 15TH ED. Rev. P. 502.03[3][a] (citing *Lisk Elec., Inc. v. Fesco Plastics Corp. (In re Fesco Plastics Corp.)*, 996 F.2d 152, 155 (7th Cir. 1993)).

The Senior Trustee's reliance on cases such as *Credit Suisse First Boston Mortgage Capital LLC v. Cohn*, No. 03 Civ. 6146, 2004 WL 1871525 (S.D.N.Y. Aug. 19, 2004), where a guarantor was held liable for interest accruing after the bankruptcy of the primary debtor, is misplaced. The Senior Trustee has cited to no case characterizing a subordinated creditor as a codebtor or holding that a subordinated creditor assumes an independent contractual obligation to answer to the senior creditor for the contractual liabilities of the debtor. *Cf.* COLLIER ON BANKRUPTCY, 15th Ed. Rev. P. 502.06[2][b] (In order to find a codebtor relationship, "there must exist . . . a shared liability to the same party on the same claim.").

This is not surprising, since, as the First Circuit observed, all the subordinated creditor agrees to do is get in line behind the senior creditor with respect to payments due *from the debtor* – and only to the extent expressly provided in the subordination agreement. *See Bank of New England Corp.*, 364 F.3d at 361 ("[S]ubordination agreements typically provide that one creditor will subordinate its *claim* against the debtor (the putative bankrupt) in favor of the *claim* of another creditor. This subordination alters the normal *priority* of the junior creditor's claim so

that it becomes eligible to receive *a distribution* only after the claims of the senior creditor have been satisfied.") (emphases added).    Subordinated debt does not in any way agree to pay the debtor's obligations to senior debt; it merely agrees to subordinate its recovery to the prior payment of the senior debt.  Because of this fundamental distinction (and the legal consequences that flow from it), the Senior Trustee's contention that subordination is the same as a guaranty has no merit whatsoever.

> **2.    The Definition of Senior Indebtedness in the Indentures Does Not Include Post-Petition Interest.**

The Senior Trustee argues that the definition of "Senior Indebtedness" in the Junior Indentures includes post-petition interest, because the definition does not expressly exclude post-petition interest.  (ST Brief at 41-42.)

> Section 1.01 of the Junior Indentures defines the "Senior Indebtedness" as:
>
> the principal of, premium, if any, and interest on (a) all indebtedness for money borrowed, whether outstanding on the date of execution of this Indenture or thereafter created, assumed or incurred, except (i) the Company's Floating Rate Subordinated Notes due 1996, (ii) such indebtedness as is by its terms expressly stated to be not superior in right of payment to the [Subordinated Notes] and (iii) such indebtedness as is by its terms expressly stated to rank <u>pari</u> <u>passu</u> in right of payment with the [Subordinated Notes], and (b) any deferrals, renewals or extensions of any such Senior Indebtedness.

(ST App. Ex. 1 at ¶¶ 40, 44.)   The Senior Trustee predicates its argument on the inclusion of the phrase "such indebtedness as is by its terms expressly stated not to be superior in right . . ." among the enumerated exceptions to Senior Indebtedness.  The Senior Trustee contends that in the absence of a provision excluding post-petition interest from the definition of "Senior Indebtedness," the definition should be interpreted as including post-petition interest.

42

As an initial matter, this argument is at odds with the ruling by the First Circuit in this case. The subordination provisions of the Junior Indentures incorporate the defined term "Senior Indebtedness;" yet the First Circuit still found them to be ambiguous. *See Bank of New England Corp.*, 364 F.3d at 367 ("[W]e believe the subordination provisions—as they apply in bankruptcy—are ambiguous."). If the Court of Appeals believed the definition of "Senior Indebtedness" saved the subordination provisions from ambiguity, this dispute would not be before the Court.

The Senior Trustee's construction also ignores basic principles of grammar and contract construction. The definition of Senior Indebtedness begins by defining *the elements or terms* of Senior Indebtedness as including "the principal of, premium (if any), and interest on (a) all indebtedness on money borrowed . . . except." Having first defined *the actual terms* of Senior Indebtedness, the three subsequent enumerated clauses, including the clause designating "such indebtedness as is by its terms expressly stated not to be superior in right to [the Subordinated Notes]," delineate the *issuances* of other indebtedness that are not to be regarded as "Senior Indebtedness" — for example, the Floating Rate Subordinated Notes. (*See* ST App. Ex. 1 at ¶ 44.)

But post-petition interest is not a debt issuance; it is a potential *feature* that might attach to any given issuance of indebtedness. The inclusion of a provision regarding post-petition interest among the other exclusions, which all relate to specific debt issuances, would be contextually bizarre. It would be akin to saying "all fruit except oranges, apples, and redness." If the concept of post-petition interest were to be addressed in the definition of Senior Indebtedness, the most logical place for it would have been in the initial phrase that actually

defines the elements of Senior Indebtedness, not in the enumerated exceptions that define what debt issuances will not constitute Senior Indebtedness.[52]

### 3. The Provision in the Junior Indentures Concerning Continuing Events of Default Sheds No Light on the Underlying Ambiguity in the Subordination Provisions

The Senior Trustee argues that Section 12.02 of the Junior Indentures — which provides that no payments can be made to holders of Junior Notes if there is an "event of default" under the Senior Indentures — cures any ambiguity in the subordination section of the Junior Indentures. (ST Brief at 39, 42-43.) The Senior Trustee points to two possible "events of default" — the failure to pay interest and the commencement of bankruptcy proceedings — that it claims prohibit payments to holders of Junior Notes. *Id.* This contention likewise lacks merit.

*First*, Section 12.02 expressly excludes from its operation events of default that have been cured and circumstances where holders of Senior Notes have received full payment. (ST App. Ex. 5 at § 12.02.) Thus, the Senior Trustee's argument begs the question of whether the holders of Senior Debt have received their legal entitlement — if so, there is no event of default related to interest payment. *Second*, taken to its logical conclusion, if the Senior Trustee's contention were correct, an event of default caused by BNEC's bankruptcy filing would prohibit any payment to holders of Junior Notes — even where holders of Senior Debt received post-petition interest — because a bankruptcy-triggered default can never be cured. Such a result is illogical and not the intended meaning of Section 12.02.

---

[52]    For example, the definition of "Senior Indebtedness" could have read: "principal of, premium (if any), and interest (including interest accruing after the commencement of a bankruptcy case)." This is precisely where the post-petition concept is incorporated into the definition of "Debt" in the 1999 Revised Model Simplified Indenture. (JT App. Ex. 20 at 1124-25, 1173-75.) Such a clause, however, is conspicuously absent from the definition of "Senior Indebtedness" in the Junior Indentures. (ST App. Ex. 1 at ¶ 44.)

*Finally*, these very provisions were before the First Circuit, which considered the subordination obligations taken as a whole. *See Bank of New England Corp.*, 364 F.3d at 367 ("Although each word, taken in isolation, may have a reasonably definite meaning, we must examine these words collectively. When we do, ambiguity surfaces.") (citations omitted). If this provision had eliminated the ambiguity in the subordination provisions, the First Circuit would not have remanded the dispute for factual findings as to the parties' intent.

>   4.    **The Different References to Junior and Senior Notes in the Subordination Provisions Do Not Indicate that the Holders of Senior Notes Are Entitled to Post-Petition Interest.**

The Senior Trustee argues that the descriptions of Junior and Senior Notes in Section 12.03 of the Junior Indentures demonstrate that the holders of Senior Notes are entitled to post-petition interest. (ST Brief at 40-41.) Section 12.03 provides, in part:

>   SECTION 12.03. Payment Over of Proceeds Upon Dissolution, Default, etc. of the Company.
>
>   The Company agrees that upon (i) the occurrence of any event of default referred to in Section 12.02 above which shall not have been cured or waived or (ii) any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, conservatorship or other proceedings, *all principal (and premium, if any), sinking fund payments and interest due or to become due upon all Senior Indebtedness of the Company shall first be paid in full*, or payment thereof provided in money or moneys worth in accordance with its terms, before any payment is made on account of *the principal of or interest on the indebtedness evidenced by the [Junior Notes] due and owing at the time*. . . .

(ST App. Ex. 1 at ¶ 43; emphases added.)

The Senior Trustee contends that because the description of Senior Notes is broader than the description of Junior Notes, the holders of Senior Notes must be entitled to collect post-petition interest. (ST Brief at 40.) This finds no support in the Junior Indentures,

which must be construed as a whole.  It is illogical to use the passing description of Junior Notes in Section 12.03 as a yardstick to measure the entitlements of Senior Notes.  The description of Junior Notes in Section 12.03 is cursory, as it is not the purpose of Section 12.03 to define the elements of the Junior Notes.  The Senior Trustee's effort to measure the entitlement of Senior Note holders by comparison to a passing description of Junior Notes in the subordination provisions of the Junior Indentures (a provision which does not define the elements of Junior Notes) is again inconsistent with the First Circuit's ruling on ambiguity and fails as a matter of contract construction.

For all of these reasons, the Bankruptcy Court's decision was consistent with terms of the Junior Indentures as a whole.

C.    **The Bankruptcy Court Correctly Declined to Apply the Doctrine of *Contra Proferentem*.**

Finally, the Senior Trustee revisits the doctrine of *contra proferentem*, arguing as it did below that the Junior Indentures should be construed against the Junior Trustees as the purported drafters.  (ST Brief at 43-45.)  *Contra proferentem* is a discretionary tool of contract construction applied under limited circumstances — where equity favors it and only as a "last resort" — when there is no relevant extrinsic evidence to shed light on the meaning of an ambiguous term and a court must decide the meaning of contractual provisions as a matter of law.  *See* 11 WILLISTON ON CONTRACTS § 32:12 (4th ed.) ("The rule of *contra proferentem* is generally said to be a rule of last resort and is applied only where other secondary rules of interpretation have failed to elucidate the contract's meaning.  The application of the rule may be further limited by the degree of sophistication of the contracting parties or the degree to which the contract was negotiated.")

New York courts have held that it is improper to apply the rule of *contra proferentem* when there is other extrinsic evidence that sheds light on the parties' intent.  *See Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000) (quoting with approval the trial court's statement that "where the relevant extrinsic evidence offered raises a question of credibility or presents a choice among reasonable inferences the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the *contra proferentem* rule") (citations and internal quotations omitted);  *Rottkamp v. Eger*, 346 N.Y.S.2d 120, 127-28 (Sup. Ct. 1973).

The Bankruptcy Court correctly determined that there was ample evidence of intent.  Moreover, application of the doctrine is inconsistent with the Senior Trustee's own assertion that the Junior Trustees did not draft the Junior Indentures.[53]  The Senior Trustee's expert, Robert Landau, testified that indenture trustees are rarely if ever involved in the drafting of indentures, stating that their role is to "read it, to understand that there are subordination provisions in there.  .  .  .  And that's it."  (ST App. Ex. 8 (11/17/08) at 149:18-25.) Notwithstanding the testimony of its own expert witness to the contrary, the Senior Trustee asks this Court to apply a doctrine that calls for ambiguities to be resolved *against the drafter*.  The Senior Trustee cannot have it both ways.

In addition, the Senior Trustee misstates the law concerning the application of *contra proferentem*.  The Senior Trustee asserts that, as a third-party beneficiary, it is entitled to

---

[53]    The rule of *contra proferentem* is applied to construe contractual terms against a party only when it is clear that that party actually drafted the ambiguous terms in dispute.  *See, e.g., 67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 249 (1975); *Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997). Where it is unclear which party actually drafted a particular provision, application of the rule is inappropriate. *See, e.g.*, *Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 951 (2d Cir. 1965).

the benefit of *contra proferentem* under New York law.  The principal case that it cites in support

of its position is *Newman & Schwartz v. Aspludh Tree Expert Co., Inc.*, 102 F.3d 660 (2d Cir.

1996).  In that case, the Second Circuit found that the district court erred by failing to liberally

construe all possible inferences of fact and law (including the potential applicability of *contra*

*proferentem*) in favor of the non-moving party on a Rule 12(b)(6) motion to dismiss.  *Id.* at

663.[54]  Notably, the circuit court in *Newman* indicated that the district court's refusal to apply

*contra proferentem* may well have been appropriate in the summary judgment context.  *Id.*

Thus, all the Senior Trustee has shown is that a third-party beneficiary may be entitled to the

benefit of *contra proferentem* in determining whether the allegations in its complaint are

insufficient to state a cause of action for purposes of a 12(b)(6) motion.  These cases have no

bearing on the applicability of *contra proferentem* in the procedural posture of the Bankruptcy

Court's evidentiary inquiry.

Finally, "the Second Circuit has noted that New York law has become

increasingly reluctant, except 'as a matter of last resort,' to apply the rule construing ambiguous

contract terms against the drafter and that the doctrine is 'generally inappropriate if both parties

are sophisticated.'"  *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y.

2003) (internal citations omitted); *see also Pacifico v. Pacifico*, 190 N.J. 258, 268 (2007) ("If

both parties are equally 'worldly-wise' and sophisticated, contra proferentem is inappropriate."

---

[54]    *Metro. West Asset Mgmt., LLC v. Magnus Funding, LTD*, the other case cited by the Senior
Trustee in support of its position, also involved a motion to dismiss on the pleadings and is thus similarly
inapposite.  No 03 Civ. 5539 (NRB), 2004 WL 1444868, at *3 (S.D.N.Y. 2004) (noting that a 12(b)(6)
motion may be granted only if, taking all factual allegations in the complaint as true, "it appears beyond
doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to
relief.").

(quoting *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199 (1st Cir. 1987)).  Thus, its application here, even as a last resort, is inappropriate.

Neither the language of the Junior Indentures nor the circumstances surrounding the formation and execution of the Junior Indentures support the interpretation urged by the Senior Trustee.  To the contrary, the most reasonable interpretation of the subordination provisions is that they do not contemplate a priority in payment of post-petition interest in favor of the Senior Note holders.  *First*, the subordination provisions expressly define the scope of subordination in terms of obligations actually borne by BNEC.  Since BNEC has no obligation to pay post-petition interest, the Senior Note holders' subordination entitlement does not include post-petition interest.  (ST App. Ex. 1 at ¶ 41.)  *Second*, none of the parties who participated in negotiating, drafting, or executing the Junior Indentures had an incentive to provide for the payment of post-petition interest to Senior Note holders.  (*See supra* Part I.A.3.)  *Third*, the 1983 Model Indenture, upon which the Bankruptcy Court could have properly relied to determine the broader context in which indentures were drafted, required the use of explicit language to provide a right to post-petition interest to Senior Note holders.  (ST App. Ex. 12 at 769, 809.)[55]

---

[55]    These "surrounding circumstances" are distinct from (but may partially overlap with) the extrinsic evidence the court may consider when construing intent of the parties as a factual matter.  Unlike extrinsic evidence of intent, the "'surrounding circumstances' relied upon by courts when interpreting ambiguous contracts as a matter of law do not embrace either the prior contemporaneous collateral agreements of the parties or their understanding of what particular terms in their agreement mean.  Rather, the term refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties."    11 WILLISTON ON CONTRACTS § 32:7 (4th ed.).

## CONCLUSION

Upon remand and after engaging in "differential factfinding," the Bankruptcy Court found by a preponderance of the evidence that the parties to the Junior Indentures did not intend to include post-petition interest in the subordination entitlements of holders of Senior Notes. That factual finding was not clearly erroneous, and the Fourth Distribution Order should be affirmed.

Dated:  August 17, 2009

SHATZ, SCHWARTZ AND FENTIN, P.C.

By:  /s/ Steven Weiss
     Steven Weiss

1441 Main Street, Suite 1100
Springfield, MA 01103
Tel:  (413) 737-1131
Fax:  (413) 736-0375

*Counsel for The Bank of New York Mellon Trust
Company, National Association, and U.S. Bank
National Association, as Indenture Trustees*

and

| | |
|---|---|
| COVINGTON & BURLING LLP | DORSEY & WHITNEY LLP |
| 620 Eighth Avenue | 50 South Sixth Street, Suite 1500 |
| New York, New York 10018 | Minneapolis, MN 55402 |
| Telephone:  (212) 841-1000 | Telephone: (612) 340-2600 |
| Facsimile:    (212) 841-1010 | Facsimile: (612) 340-2643 |
| Dianne Coffino, Esq. | Patrick J. McLaughlin, Esq. |
| C. William Phillips, Esq. | Katherine A. Constantine, Esq. |
| Jennifer O. Farina, Esq. | Todd Pearson, Esq. |
| | |
| *Counsel for The Bank of New York Mellon Trust Company, National Association, as Indenture Trustee* | *Counsel for U.S. Bank National Association, as Indenture Trustee* |